Jack B. SHINHOLSTER, et al., Plaintiffs,

v.

Bob GRAHAM, Governor of the State of Florida, et al., Defendants.

TCA 80–1019.

United States District Court, N. D. Florida, Tallahassee Division.

Oct. 9, 1981.

On Motion for Reconsideration Nov. 30, 1981.

Jack B. Shinholster, pro se.

Marc E. Taps and Judith Fendrich, Legal Services of North Florida, Tallahassee, Fla., for plaintiffs.

Gerald B. Curington, Asst. Atty. Gen., Dept. of Legal Affairs, Claire D. Dryfuss, Asst. Gen. Counsel, Dept. of Health and Rehabilitative Services, Tallahassee, Fla., for defendants.

STAFFORD, Chief Judge.

This cause having come on for consideration upon the magistrate's report and recommendation (Document 39) dated October 9, 1981, and the court having considered the report and recommendation and the objections of defendants (Document 41) and determined that the same should be adopted, it is

ORDERED:

1. The magistrate's report and recommendation is adopted and incorporated by reference in this order of the court.

2. The defendants' motion for partial summary judgment should be, and the same is hereby, granted. Plaintiffs' civil rights claims for damages and pendent state tort claims for damages are dismissed and are hereby struck from the plaintiffs' amended complaint.

## ORDER, REPORT AND RECOMMENDATION

ROBERT L. CRONGEYER, Jr., United States Magistrate.

This civil rights matter comes on for consideration of the defendants' third affirmative defense, as presented in their answer (document 24). The defendants have raised the doctrine of exhaustion of administrative remedies as an affirmative defense, but since the failure to exhaust available and adequate administrative remedies could result in dismissal in the early stages of this action, the defendants' affirmative defense shall be treated as a motion to dismiss.

The defendants have also filed a motion for partial summary judgment (document 28) on the issue of liability for damages. The defendants assert that inasmuch as they are being sued solely in their official capacities, suit for damages against them is barred by the Eleventh Amendment and the doctrine of sovereign immunity. Additionally, the defendants contend that the plaintiffs' pendent state tort claim is similarly barred by the doctrine of sovereign immunity inasmuch as the plaintiffs have failed to comply with conditions precedent to a waiver by the State of Florida of its sovereign immunity from damages attributable to the state's officials, employees, or agents.

## I. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ The Court of Appeals for the Fifth Circuit in *Patsy v. Florida International University*, 634 F.2d 900 (5th Cir. 1981), held that in appropriate cases brought pursuant to Section 1983, Title 42, United States Code, plaintiffs must have exhausted state administrative remedies before a federal court may entertain the civil rights lawsuit. In order for there to be a requirement of exhaustion of administrative remedies, it must first be shown that "certain minimum conditions [have been] met before resort to state administrative remedies can

be made a prerequisite to proceeding under Section 1983." *Id.* at 912. The minimum conditions delineated in *Patsy* which must be satisfied by the administrative remedies claimed to be applicable in this case are:

1. Florida statutes or administrative agency rules must provide an orderly system of review or of appeal.

2. Florida administrative agencies must be able to grant relief "more or less" commensurate with the relief requested by the plaintiffs' Section 1983 claims.

3. Relief from the Florida administrative agencies must be available within a reasonable time.

4. The procedures for obtaining relief through the Florida administrative agencies must be fair, must not be unduly burdensome, and must not be used to harass or otherwise discourage persons with legitimate claims.

5. Interim relief must be available through the Florida administrative agencies to prevent irreparable injury and to preserve the plaintiffs' rights under Section 1983 until the administrative process has been concluded.

*Id.* at 912–13. If a certain administrative scheme fails to satisfy any of these minimum conditions, exhaustion of that administrative remedy is not required. On the other hand, as the court in *Patsy* declared:

Where these minimum standards are met, the court will need to further consider the particular administrative scheme, the nature of the interest the plaintiff seeks to protect, the values served by the exhaustion doctrine and the proper balance of these interests in this type of case.

*Id.* at 913.

Likewise, the court must consider if any of the several exceptions to the exhaustion doctrine apply which would thereby preclude requiring exhaustion of a particular administrative scheme.

The minimum conditions specified in *Patsy*, 634 F.2d at 912–13, are essentially a restatement of the "plainly inadequate" administrative remedies exception. The "plainly inadequate" exception enunciated in *Patsy* is:

[E]xhaustion is not required when the prescribed administrative remedy is plainly inadequate because either no remedy is available, the available remedy will not give relief commensurate with the claim, or the remedy would be so unreasonably delayed as to create a serious risk of irreparable injury.

*Id.* at 903.

Exhaustion is also not required when the plaintiff challenges the constitutionality of a statute, rule, or policy, and the administrative agencies do not have the jurisdiction, nor the authority, to determine constitutional issues, or the administrative procedures neither contemplate, nor provide the capacity to consider and decide, claims of unconstitutional practices. *Id.; Curtis v. Taylor,* 648 F.2d 946 (5th Cir. 1980). Similarly, if the merits of the plaintiff's claims are "for all practical purposes coextensive with ... the questions of adequacy of the administrative remedy," exhaustion is not required. *Patsy,* 634 F.2d at 904. Finally, "exhaustion is not required if it would be futile to comply with the administrative procedures because it is clear that the claim will be rejected." *Id.*

## A. FLORIDA ADMINISTRATIVE PROCEDURE ACT

The Florida Administrative Procedure Act (FAPA), Florida Statutes, Chapter 120, provides for a proceeding of an adjudicatory nature before an administrative hearing officer. Fla.Stat. § 120.57 (Supp. 1980). The defendants contend that administrative proceedings and remedies provided by the FAPA meet the "Patsy minimum standards" and are therefore adequate to trigger the requirement of exhaustion by the plaintiffs. The Fifth Circuit has disagreed and specifically has held in *Curtis v. Taylor,* 648 F.2d 946 (5th Cir. 1980), that the current FAPA is "plainly inadequate" for

adjudicating the validity of agency rules (which, of course, include policies and practices constituting or having the effect of rules; see Fla.Stat. § 120.52(14) (1979); *McDonald v. Dept. of Banking and Finance*, 346 So.2d 569, 581 (Fla. 1st Dist.Ct.App. 1977); *Florida Cities Water Co. v. Florida Public Service Commission*, 384 So.2d 1280 (Fla.1980) (citing *McDonald* with approval) under the Constitution or federal statutes.

It is clear that although the FAPA excludes prisoners, from status as parties whose "substantial interests" are affected by Florida administrative decisions and can therefore challenge such decisions under Section 120.57, Florida Statutes (Supp. 1980), the plaintiffs in this case do not fall within the definition of "prisoner" and therefore may be parties to a Section 120.57 administrative proceeding. *See also* Fla. Stat. § 120.52(10) (1979). Section 944.02(5) defines "prisoner":

> "Prisoner" means any person who is under arrest and in the lawful custody of any law enforcement official, or any person convicted and sentenced by any court and committed to any municipal or county jail or state prison, prison farm, or penitentiary, or to the custody of the department [of Corrections], as provided by law.

Fla.Stat. § 944.02(5) (1979).

The Fifth Circuit's rationale in *Curtis* for finding the FAPA "plainly inadequate" is based on the conjoining of the FAPA's failure to meet the second "minimum standard" with the exception to the exhaustion doctrine that the administrative proceedings neither contemplate nor provide the authority or capacity to consider and decide claims of unconstitutional practices, policies, or rules. The court in *Curtis* concluded that the FAPA, although normally permitting a Florida administrative hearing officer to grant injunctive and declaratory relief, fails to authorize the hearing officer to grant not only the "more or less" commensurate relief required by *Patsy*, but *any* relief sought by plaintiffs raising constitutional and civil rights claims, because the hearing officer lacks jurisdiction to consider and resolve constitutional issues. The Fifth Circuit stated:

> Although Section 120.57 of the Act [FAPA] provides for a proceeding of an adjudicatory nature before an administrative hearing officer to challenge agency action, the authority of that hearing officer is limited. The Florida courts have held that "the administrative hearing officer lacks jurisdiction to consider constitutional issues...." *Gulf Pines Memorial Park v. Oaklawn Memorial Park, Inc.*, 361 So.2d 695, 699 (Fla.1978). *See also Department of Revenue v. Amrep Corp.*, 358 So.2d 1343 (Fla.1978); *E.T. Legg & Co. v. Franza*, 383 So.2d 962 (Fla. 4th Dist.Ct.App.1980). "The Administrative Procedure Act could not and does not relegate Fourteenth Amendment questions to administrative determination, nor restrict the occasions for judicial consideration of them ... nor otherwise impair the judicial function to determine constitutional disputes." *Department of Revenue v. Young American Builders*, 330 So.2d 864, 865 (Fla. 1st Dist.Ct.App.1976).

.    .    .    .    .

> ... Because the administrative hearing provided by Section 120.57 could not resolve the claims advanced by the plaintiffs, the failure to exhaust that avenue of relief will not bar the resort to federal court in this case. [Footnote omitted.]

648 F.2d at 948. Like the plaintiffs in *Curtis*, the plaintiffs in the present case cannot avail themselves of the declaratory and injunctive relief provided by the FAPA because the hearing officer is unauthorized to consider and decide constitutional issues such as those raised by the plaintiffs' Section 1983 claims.

Likewise, the plaintiffs' claims for damages may not be administratively determined under the FAPA. It is true, however, that a civil tort claim may be presented to the defendant Department of Health

and Rehabilitative Services (HRS) for initial administrative determination and settlement before such a claim may be brought to court. Section 768.28(6), Florida Statutes (Supp.1980), states:

> (6) An action [in court] shall not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also, except as to any claim against a municipality, presents such claim in writing to the Department of Insurance, within 3 years after such claim accrues and the Department of Insurance or the appropriate agency denies the claim in writing. The failure of the Department of Insurance or the appropriate agency to make final disposition of a claim within 6 months after it is filed shall be deemed a final denial of the claim for the purposes of this section. . . .

Section 768.28(6) sets out the conditions precedent for bringing a civil *tort* claim and does not establish any requirement for exhaustion of administrative remedies before a federal civil rights suit may be brought. Such a civil tort claim, requiring presentation to a state agency as a prerequisite to seeking relief in court, may arise under Section 394.459(1), Florida Statutes (Supp. 1980), which establishes liability for damages against those persons who are found to have violated a patient's rights as delineated in the Florida Mental Health Act, Chapter 394, Part I, Florida Statutes (1979 and Supp. 1980). Section 394.459(13) states:

> (13) LIABILITY FOR VIOLATIONS.— Any person who violates or abuses any rights or privileges of patients provided by this act shall be liable for damages as determined by law. Any person who acts in good faith in compliance with the provisions of this part shall be immune from civil or criminal liability for his actions in connection with the admission, diagnosis, treatment, or discharge of a patient to or from a facility. However, this section shall not relieve any person from liability if such person is guilty of negligence.

Thus, while the failure to satisfy the administrative "exhaustion" requirement of Section 768.28(6) would preclude a civil tort claim under Section 394.459(13) in the state courts as well as a pendent state tort claim in the federal courts, it would not prevent a federal court from entertaining a civil rights suit brought pursuant to 42 U.S.C. § 1983.

In sum, then, neither the FAPA nor the Florida statutes establishing prerequisites for bringing damage suits against the state or its agencies provide adequate administrative schemes so as to invoke the requirement that the plaintiffs exhaust administrative remedies before bringing this civil rights suit before this court.

## B. ABUSE REPORTING SYSTEM

██ The defendants assert that the administrative scheme within the Abuse Reporting System established pursuant to the Florida Mental Health Act, Chapter 394, Part I, Florida Statutes, and Chapter 827 (Abuse of Children or Disabled Persons), Florida Statutes, satisfies the "minimum standards" as well as other policy considerations for requiring exhaustion of administrative remedies in a Section 1983 civil rights suit. A review of the Abuse Reporting System reveals, however, that not only does it have the same deficiency as the FAPA in failing to provide for compensatory relief for claims of constitutional deprivations, but it is also fatally devoid of provisions for the type of orderly system of review or of appeal contemplated by the Fifth Circuit in *Patsy*. Also like the administrative scheme of the FAPA, no authority is given to administrative personnel to determine whether alleged wrongful conduct constitutes a constitutional violation, or whether such conduct has caused constitutional injury.

The Florida Mental Health Act requires that:

> The department [of Health and Rehabilitative Services] shall adopt rules providing a procedure for reporting abuse. Fa-

cility staff shall be required, as a condition of employment, to be familiar with the procedures for reporting of abuse. Fla.Stat. § 394.459(5)(f) (Supp. 1980); *see also*, Fla.Admin.Code R. 10E–5.11(5)(i). Section 827.09, Florida Statutes (Supp. 1980), also mandates the reporting of abuse and sets out procedures for reporting. Persons suffering from mental illness are included within the scope of the abuse reporting system's protections:

(3) REPORTS OF ABUSE.—

(a) Any person, including, but not limited to, a physician, psychologist, nurse, teacher, social worker, employee of a public or private facility serving disabled or aged persons, or parent of a disabled person or an individual suffering from the infirmities of aging, who has reason to believe that a disabled person or an individual suffering from the infirmities of aging has been subjected to abuse shall report, or cause reports to be made, to the department. When the attendance of any person with respect to a disabled person or an individual suffering from the infirmities of aging is pursuant to the performance of services as a member of a staff of a hospital, training center, clinic, school, or similar facility, he shall also notify the person in charge of the facility or his designated delegate, who shall also report or cause reports to be made in accordance with the provisions of this section.

(b) Every facility serving disabled persons or individuals suffering from the infirmities of aging shall inform residents of their right to report abusive practices and shall establish appropriate policies and procedures to facilitate such reporting.

.    .    .    .    .

(5) NATURE AND CONTENT OF REPORT.—

An oral report shall be made immediately by telephone or otherwise to the department [of Health and Rehabilitative Services], followed as soon thereafter as possible by a report in writing. Such reports shall contain, if known, the names and addresses of the disabled person or individual suffering from the infirmities of aging and his parents or other persons responsible for his care, other disabled persons or individuals suffering from the infirmities of aging who are threatened by abusive conduct, the abused person's age, the nature and extent of his disability, the nature and extent of the injuries, and any other information that the reporter believes might be helpful in establishing the cause of the injuries, abuse, or maltreatment and the identity of the perpetrator.

(6) RESPONSIBILITIES OF PUBLIC AGENCIES.—

Upon receipt of a report of abuse of a disabled person or of an individual suffering from the infirmities of aging, the department shall cause an immediate investigation to be made and shall in turn, upon determining probable cause, notify the state attorney. The department shall, within 24 hours of receipt of the report, notify the appropriate human rights advocacy committee, as established pursuant to s. 20.19(7), that an alleged abuse has occurred. Such notice may be accomplished verbally or in writing and shall include the name of the person alleged to have been abused and the nature of the report. All state, county, and local agencies have a duty to cooperate fully with the department, transmit reports of abuse to the department, and protect and enhance the welfare of abused persons and disabled persons or individuals suffering from the infirmities of aging who are potentially subject to abuse detected by a report made pursuant to this section.

In accordance with these statutory requirements, the Department of Health and Rehabilitative Services (HRS) has promulgated the *Adult Abuse and Neglect Procedures Manual*, HRSM 140–2 (hereinafter referred to as either "the manual" or HRSM 140–2),

which details the procedures for implementing the Abuse Reporting System.

At the outset, it is noted that the relief contemplated by the manual and the Abuse Reporting System is "more or less" in the nature of declaratory and injunctive relief and does not provide for compensatory relief, i.e., liability for damages. As noted in the discussion *supra* concerning the FAPA, the Florida Mental Health Act contemplates a claim for damages solely by the bringing of a civil tort suit in the courts after presentation of the claim to HRS. While the relief resulting from using the Abuse Reporting System may assist in determining liability and may have evidentiary value to a claim for damages, the procedural scheme would not produce, nor does it contemplate producing, an administrative decision awarding damages.

The procedures for abuse reporting are invoked upon the receipt by the Abuse Registry, from essentially any source, of an alleged abuse or neglect of aged or disabled adults. HRSM 140–2, § 3.1.

The Abuse Registry, or Central Registry as it is referred to by Section 827.09(7), Florida Statutes, is the record keeping and referral agency in the Department of Health and Rehabilitative Services. *Id.* at § 1.4(n). The Abuse Registry records the complaints and refers them to the appropriate professional staff in the district from which the complaint arose. If the complaint is one of abuse or neglect, then the case is referred to a Developmentally Disabled Abuse (DDA) worker of the Protective Services division of HRS for an assessment. *Id.* at § 3.3. There may be instances where the DDA worker will receive the initial report; the DDA worker in that case will make a report to the Abuse Registry and will receive further information and instructions on the case from the Registry. *Id.*

The assessment of an alleged abuse must commence immediately or as soon as possible. *Id.* at § 3.3(e)(1). The assessment of an alleged neglect must be started within three days of receiving the initial report. *Id.* at § 3.3(c)(3). HRSM 140–2 describes the role of the DDA worker making the assessment:

> The role of the DDA worker is not that of a policeman or of an authoritarian—it is a helping one. The role of the DDA worker is not an investigative one; the DDA worker's main responsibility (under the authority granted to him/her under Florida Statute 827.09) is to assess an alleged abuse and/or neglect situation to determine if abuse/and/or neglect occurred and what, if any, additional services are needed to protect the allegedly abused and/or neglected person. The investigative role remains with the law enforcement officials and the State Attorney's office.

*Id.* at § 3.3(f). Even though the DDA worker's role is characterized as not being an investigator, the specific duties of the DDA worker in making the assessment, as outlined in HRSM 140–2, clearly require the DDA worker to be an investigator, although not in the criminal or law enforcement sense, in order to effect the remedial objectives of the Abuse Reporting System. The DDA worker's investigation consists of inquiries, interviews, and solicitation as to the background and status of the alleged victim: physical environment, social environment, personal appearance, physical health, mobility, mental health, and economic situation. HRSM 140–2, § 3.3(f)(7). Witnesses to the alleged abuse as well as the reporter and the alleged perpetrator are to be interviewed and investigated. *Id.* at § 3.3(f)(8)–(10).

The DDA worker completes an "Abuse Assessment Report" within 3 days after completing the investigation. *Id.* at § 3.3(f)(15). If abuse or neglect is found to exist, the DDA, along with submitting the "Abuse Assessment Report," submits to the Abuse Registry and the state hospital or facility director "Recommendations to the Facility Director" for correction of deficiencies discovered and assessed. *Id.* at § 3.3(h).

Within 15 days, the HRS facility director is to submit to the DDA worker a "Plan of Correction" in response to the DDA worker's recommendations. The "Plan of Correction" includes "what the facility plans to do or has already done to correct that situation [the abuse or neglect of a person in the facility]. It also is to include what [facility personnel] can not [sic] do and the reasons for it, as well as what [facility personnel] won't do and the reasons for it." *Id.* at § 3–3(i).

The final stage of the Abuse Reporting System is the monitoring of the "Plan of Correction" submitted by the facility director. The monitoring is performed by the District Aging and Adult Services Program Supervisors. *Id.* at § 7–2(c). Although the manual does not detail the monitoring process, these supervisors apparently oversee the "Plan of Correction" until its corrective measures are fully accomplished. *Id.*

The defendants contend that since most of the constitutional claims alleged by the plaintiffs are the same as those types of complaints which the Abuse Reporting System is designed to resolve, the plaintiffs' complaints can be alleviated administratively, thereby obviating the need for the court to review the constitutional claims which can be administratively mooted. HRSM 140–2 delineates complaints of abuse, allegedly applicable to this case, which are required to be reported:

(14) Unnecessary physical restraints used.

(15) Excessive physical restraints used.

(16) Unnecessary chemical restraints used.

(17) Excessive chemical restraints used.

(18) Harmful treatment program.

.     .     .     .     .

(22) Forced to take medication not prescribed.

(23) Forced to take medication contrary to prescription.

(24) Forced to take excessive medication.

(25) Time out or seclusion techniques used excessively.

(26) Locked in a room, closet, shed, etc. inappropriately.

.     .     .     .     .

(37) Deprived by persuasion or coercion of any civil right to which subject would be otherwise entitled.

*Id.* at § 3–2(h). HRSM 140–2 also provides that complaints of "neglect" should be reported. "Neglect" complaints include those complaints of inadequate medical treatment and inadequate non-medical treatment, concerning items such as food, overall welfare, clothing, and shelter. *Id.* at § 3–2(i).

It is true, as the defendants assert, that "the possibility of mooting constitutional issues by an agency decision favorable to the allegedly aggrieved party may alone be enough to require exhaustion of remedies." *Baldwin Metals Co., Inc. v. Donovan,* 642 F.2d 768, 772 n. 7 (5th Cir. 1981). However, the administrative scheme of the Abuse Reporting System fails to produce an agency decision which would truly moot constitutional issues, especially the claims in the present case against these two particular defendants, and inherently fails to adequately provide review and appeal as contemplated by the *Patsy* decision.

The plaintiffs' complaint consists of several claims of particular instances where they have been subjected to abusive or negligent conduct. The Abuse Reporting System is clearly designed for providing remedies for these particular complaints against certain, immediate perpetrators. However, the chief complaint of the plaintiffs is the constitutional violations resulting from the overall practices and conduct of personnel implementing and applying the policies and rules which the defendants promulgated and enforce, as well as practices to which they acquiesce. Under the Abuse Reporting System, a complaint against the named defendants could not be acted upon since it is the facility director who must establish a "Plan of Correction." Inasmuch as the de-

fendants are the facility director's superiors, he would be hardpressed to ensure, if not incapable of ensuring, the correction of the policies, practices, and rules of his superiors. Similarly, since the complaints of abuse and neglect are examined no higher than the level of District Aging and Adult Services Program Supervisors, action against the defendants on meritorious claims could not be monitored, least of all enforced, by the supervisors who have no authority over the defendants. The Abuse Reporting System is deficient for exhaustion purposes since it fails to provide any enforceable remedy against the defendants.

The principal problem with the Abuse Reporting System, however, is that it fails to provide adequate review and appeal as contemplated by the *Patsy* decision. The essence of requiring exhaustion of administrative processes is to assure that "the action complained of is final within the institution in the sense that it is ripe for adjudication." *Patsy*, 634 F.2d at 911. However, this final administrative action must result from administrative "machinery" which can "right alleged wrongs in an orderly fashion." *Id.* When the complaints are against the responsible top echelon for their policies and practices, exhaustion is of no value if the final reviewing administrative authority is some first echelon functionary. *See id.* Under these circumstances, even if the administrative machinery is allowed to operate, the machinery is inadequate to provide the review of and the remedy against the top echelon who are outside the particular administrative process, and exhaustion should not be required.

Although the Abuse Reporting System provides a step-by-step, orderly process for the examination, investigation, assessment, and correction of a reported complaint, it is deficient in its lack of suitability to rectify the plaintiffs' claims. Once a complainant has reported an alleged abuse or neglect and has been interviewed by a DDA worker, the complainant, or his representative, drops out of the administrative process with no opportunity to confront alleged perpetrators, to respond to proposed corrective measures, to be notified of corrective measures, or to appeal to higher authority for review of the DDA worker's assessment and the "Plan of Correction." Likewise, an alleged perpetrator is not given an opportunity to confront his accusers or appeal the assessment and "Plan of Correction."

As can be determined from HRSM 140–2, the assessment and the recommendation for corrective measures are the final actions of the DDA worker, the lone administrative officer who makes the critical, final determination as to the validity of the claim and whose suggested remedies are to be applied based on his own investigation. The DDA worker is the final arbiter, without the benefit of arbitration. Relief under the Abuse Reporting System is the result of an investigative process and not of an administrative process which would provide adequate hearing, review, and appeal of a final decision.

Although it may be asserted that the monitoring district supervisors provide an avenue of review or appeal, that is not their role under HRSM 140–2. The district supervisors' responsibility is to ensure that the DDA worker's assessment and recommendations and the "Plan of Correction" are enforced. Provisions for review or appeal of the assessment or the "Plan of Correction" are ostensibly absent from HRSM 140–2.

Since the Abuse Reporting System as presently structured does not constitute an administrative scheme which provides "an orderly system of review or appeal," the exhaustion of the proceedings under the Abuse Reporting System shall not be required before this action can be brought before the court. *Patsy*, 634 F.2d at 912.

## C. GOVERNOR'S COMMISSION ON ADVOCACY FOR PERSONS WITH DEVELOPMENTAL DISABILITIES

■ The parties agree that the Governor's Commission on Advocacy for Persons

with Developmental Disabilities would not provide any relief or protection for the plaintiffs in this case since the plaintiffs are not alleged to have developmental disabilities as defined in Rule 22N–1.02, Florida Administrative Code. *See generally,* Fla. Admin.Code Ch. 22N–1. Therefore, this administrative scheme does not meet the "minimum conditions" of *Patsy* and does not require exhaustion. 634 F.2d at 912.

## D. STATEWIDE AND DISTRICT HUMAN RIGHTS ADVOCACY COMMITTEES

The defendants concede that the Statewide and District Human Rights Advocacy Committees established in Section 20.19, Florida Statutes (Supp.1980), fail to meet the "minimum conditions" and therefore would not require exhaustion before the plaintiffs' civil rights claims could be entertained by this court.

The function of the committees is to investigate and advocate, not to provide relief. While relief could possibly be obtained through negotiations, no guarantee is provided that a meritorious claim would result in relief. Neither are the committees authorized or empowered to provide interim relief. Finally, no time frames in which action must be taken are provided within this administrative scheme, so relief, if any, may not be granted within a reasonable time. Under these circumstances, this administrative process is not an adequate administrative remedy which requires exhaustion.

## E. MENTAL HEALTH ACT REGULATIONS: GRIEVANCE PROCEDURES FOR PATIENTS

The Florida Department of Health and Rehabilitative Services has promulgated rules, entitled "Florida Mental Health Act Regulations," to implement the Mental Health Act. Fla.Admin.Code Ch. 10E–5. The rules provide a procedure for patients to report and voice their claims of violation of their rights specified in Chapter 394, Florida Statutes. As noted previously in Section I. A., *supra,* Section 394.459, Florida Statutes (Supp.1980), declares the rights of patients including:

> No person who is receiving treatment for mental illness in a facility shall be deprived of any constitutional rights.

*Id.* at § 394.459(1). Specifically, the agency rules provide, in pertinent part:

> (1) Grievances without Court Action
>
> .       .       .       .       .
>
> (b) Patients in State Treatment Facilities—The procedure for processing complaints by patients who are in State treatment facilities is shown below.
>
> 1. Patients can verbalize their complaints in ward meetings and to the staff of their treatment facility.
>
> 2. Complaints not solved at the ward level may be referred to the Patient's Grievance Committee made up of appropriate hospital staff and patient representation.
>
> 3. Patients and their representatives can direct their complaints in writing to the administrator of the facility.
>
> 4. Whenever complaints are not resolved by the administrator, patients or representatives should direct their complaints in writing, by telephone, or in person to the District Administrator of the HRS District in which the facility is located.
>
> 5. If the complaint cannot be resolved by the District Administrator, it should be referred to the Assistant Secretary for Operations and, if still unresolved, to the Secretary of the Department.

Fla.Admin.Code R. 10E–5.18.

Although this grievance procedure provides a basic framework and hierarchy for review of complaints, it is clearly evident that the grievance procedure fails to ensure that resolution of complaints, or other relief, will be available within a reasonable time. Since the procedures are rather ab-

stract, it is not clear that this administrative process will be "fair and not unduly burdensome," and will not be used to "harass or otherwise discourage those with legitimate claims." *Patsy*, 634 F.2d at 912–13. Likewise, it is not completely clear what relief may be granted under these procedures, and certainly the procedures do not provide for interim relief.

Since the grievance procedure fails to satisfy all of the "minimum conditions," the plaintiffs will not be required to exhaust these administrative procedures before bringing their claims before the court.

## F. CONCLUSION

The administrative schemes and remedies available to the plaintiffs in this case have been found to be inappropriate and inadequate for this court to require exhaustion of them before the plaintiffs' civil rights claim can be brought here. Thus, the defendants' motion to dismiss must be denied, and their third affirmative defense shall be stricken.

It is noted, however, that the efforts of the court and the parties in examining and analyzing these various administrative processes should not go unnoticed and could act as a remedial aid to the Department of Health and Rehabilitative Services in providing an appropriate and adequate administrative forum for civil rights claims, if HRS so desires to establish and implement such an administrative scheme. The Fifth Circuit in *Patsy* has advocated as much:

> Prompted by appropriate judicial decisions, the state administrative agency will have the incentive and be able to hone its procedures to comply with federal requirements, both procedural and substantive, without losing the advantage of the agency's expertise, its familiarity with local conditions and awareness of the impact of particular action on related areas, and its desire to correct errors of lower level functionaries within the agency.

634 F.2d at 911.

Combining and modifying the various available administrative schemes outlined in this case could result, it should be noted, in an adequate administrative review procedure which would require exhaustion. For instance, such an administrative scheme could be established by combining the hierarchy of review found in the grievance procedure with the Abuse Reporting System and coupling these procedures with the time, notice, and hearing requirements of the FAPA, a process which, in turn, could be bolstered by the statutory authorization of the hearing officer to hear and determine constitutional issues much in the vein of the Human Rights Advocacy Committees. Thus, by dispensing with the weaknesses and conjoining the strengths of these various administrative processes, the *Patsy* "minimum conditions" could be met.

## II. IMMUNITY FROM SUIT

### A. ELEVENTH AMENDMENT AND WAIVER

The Eleventh Amendment to the Constitution of the United States provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

Facially, indeed literally, the Eleventh Amendment contains a prohibition which bars suit against a state only by a citizen of another state, although also by its plain language it does not bar a suit by one of the state's own citizens against such state. This provision, however, was long ago expanded and its intent "clarified" by the United States Supreme Court in *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), where it was held, in effect, that the clear language of the Eleventh Amendment did not really mean what it actually said, but rather that the unambiguous language of the Eleventh Amendment must be construed to mean that every state enjoys immunity not only from citizens from other states but from everyone, including citizens

of its own state. Justice Bradley, writing for the court in *Hans v. Louisiana*, found the suggestion that the Eleventh Amendment allowed suit against a state by its own citizens unthinkable. He stated:

It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of. Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, whilst the idea of suits by citizens of other states, or of foreign states was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face.... The suability of a State without its consent was a thing unknown to the law. This has been so often laid down and acknowledged by courts and jurists that it is hardly necessarily to be formally asserted.

134 U.S. at 15–16, 10 S.Ct. at 507.

Thus, the net effect of the Supreme Court's decision in this early case is that it established the Eleventh Amendment as a codification of the basic common law principle of sovereign immunity. Nonetheless, early in American jurisprudence, it was also acknowledged to be undoubted that a state could be sued by its own consent. *Curran v. Arkansas*, 56 U.S. 322, 327–28 (15 How. 304, 309), 14 L.Ed. 705 (1853); *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1882).

The Court of Appeals for the Fifth Circuit in *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir. 1981), recently summarized its interpretation of more recent Supreme Court decisions which have also upheld the doctrine of sovereign immunity under the Eleventh Amendment:

In *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978) (per curiam), the Supreme Court held that, absent an express waiver by the state of its eleventh amendment immunity, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Employees v. Department of Public Health and Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); *Parden v. Terminal Ry.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1974), neither the state nor its agencies may be sued for injunctive relief in federal court, although injunctive or prospective relief may be sought against state officials without invoking the eleventh amendment bar. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). An award by a federal court of retrospective relief, *i.e.*, damages, payable from the state treasury, is prohibited by the eleventh amendment even though the suit names a state official as the defendant. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *See Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). *Alabama v. Pugh* stresses the continuing significance of the distinction between suits against the state or an arm of the state and those against state officials even in actions seeking prospective or injunctive relief. *See Spicer v. Hilton*, 618 F.2d 232, 237 (3d Cir. 1980).

As a result of the Fifth Circuit's decision in *Sessions*, the defendants Graham and Taylor are left in the following posture: the plaintiffs' suit for retrospective relief, *i.e.*, damages, against the defendants in their official capacities is prohibited unless there is a waiver of the Eleventh Amendment immunity by the State of Florida, while injunctive or prospective relief may be sought against these defendants in their official capacities without invoking the Eleventh Amendment bar.

The question arises, then, whether the State of Florida has waived its Eleventh

Amendment immunity and has consented to suit under Section 1983 against the State of Florida, an arm or agency of the state, or its officials, agents, or employees sued in their official capacities.

The Supreme Court in *Florida Department of Health and Rehabilitative Services v. Florida Nursing Home,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132, 136 (1981), *reh. denied,* —— U.S. ——, 101 S.Ct. 2008, 68 L.Ed.2d 319 (1981) recently repeated its oft-quoted standard for deciding whether a state has waived its constitutional protection and immunity under the Eleventh Amendment:

"[W]e will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" [*Edelman v. Jordan,* 415 U.S.] at 673, [94 S.Ct. at 1360,] 39 L.Ed.2d 662 *quoting Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 53 L.Ed.2d 742, 29 S.Ct. 458 (1909).

The defendants assert that neither the Florida Constitution nor any legislative enactments could be construed to constitute a waiver by the State of Florida of its Eleventh Amendment immunity to suit in federal court. Indeed, the defendants note that this court has recognized in its own recent decisions that the State of Florida has not waived its Eleventh Amendment immunity. In *Saulsberry v. Florida State University,* No. TCA 80–855 (N.D.Fla. Jan. 9, 1981), Chief Judge Stafford of this court concluded:

Defendants Ronald Baxley, William Tanner and Troy Springer, are sued individually as well as officially in their capacities as Florida State University Police Officers. They are not proper defendants to plaintiff's 42 U.S.C. § 1983 claim in their *official capacities* since plaintiff seeks from them dollar damages which would be paid by the State of Florida. *Sections 768.28, 284.30, 284.31, and 284.38, Florida Statutes do not, in this court's opinion, constitute a waiver by the State of Flori-*

*da of its Eleventh Amendment immunity to suit in federal court.* Defendants Baxley, Tanner and Springer shall remain subject to plaintiff's § 1983 claim only in their individual capacity.

*Id.* at 1–2. (Emphasis in the third sentence added). Likewise, in *Commercial Consultants Corporation v. Walters,* No. TCA 79–0827 (N.D.Fla. Jan. 30, 1981), Judge Stafford stated:

Upon careful consideration of Sections 768.28, 284.30, 284.31 and 284.38, Florida Statutes, this court now concludes that its prior determination ... was incorrect as a matter of law, and that the State of Florida has *not* waived its Eleventh Amendment immunity to suit in federal court.

*Id.* at 2.

At this juncture it is noted that almost simultaneously with this court's decisions in *Saulsberry* and *Commercial Consultants Corporation* concerning the Eleventh Amendment immunity, the United States District Court for the Southern District of Florida in *Brooks v. Parker,* No. 80–2258–Civ–SMA (S.D.Fla. Jan. 21, 1981), held after extensive analysis that Section 768.28, Florida Statutes, when considered in light of the recent decision in *Marrapese v. Rhode Island,* 500 F.Supp. 1207 (D.R.I.1980), as well as when read *in pari materia* with Section 111.071(1)(a), Florida Statutes, constitutes a waiver of the Eleventh Amendment immunity by the State of Florida. The United States District Court of Rhode Island in *Marrapese,* after extensive constitutional analysis, found that the Rhode Island statute waiving immunity for tort liability constituted a consent to suit for "constitutional torts." Neither the *Marrapese* decision nor Section 111.071, Florida Statutes, have previously been addressed by this court.

After exhaustive examination of the applicable Florida Statutes and their legislative histories, the undersigned must conclude that the State of Florida has not statutorily waived its Eleventh Amendment

immunity for itself, nor for any arms of the state, nor for its officers, employees or agents sued in their official capacities. Likewise, the recorded legislative histories of the Florida Statutes, an aid for determining legislative intent which was unavailable to the Rhode Island court in *Marrapese*, renders application of the *Marrapese* analysis unnecessary because, as is shown hereafter, the Florida legislature's intent to limit the waiver of sovereign immunity solely to tort claims and to the exclusion of federal civil rights suits is abundantly clear.

## B. FLORIDA STATUTES AND LEGISLATIVE INTENT

▪ Article X, Section 13 of the Florida Constitution declares:

Provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereinafter originating.

Consequently, the State of Florida enacted Section 768.28, Florida Statutes (Supp. 1980), entitled "Waiver of Sovereign Immunity in Tort Actions." Section 768.28 provides, in pertinent part:

(1) In accordance with s. 13, Art. X, State Constitution the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity or liability for tort, but only to the extent specified in this Act. Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this Act.

(2) As used in this Act, "state agencies or subdivisions" include the executive departments, the Legislature, the judicial branch, and the independent establishments of state; counties and municipalities; and corporations primarily acting as instrumentalities or agencies of the state, counties, or municipalities.

.　　.　　.　　.　　.

(5) The state and its agencies and subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances, but liability shall not include punitive damages or interest for the period prior to judgment. Neither the state nor its agencies or subdivisions shall be liable to pay a claim or a judgment by any one person which exceeds the sum of $50,000 or any claim or judgment, or portions thereof, which, when totaled with all other claims or judgments paid by the state or its agencies or subdivisions arising out of the same incident or occurrence, exceeds the sum of $100,000. However, a judgment or judgments may be claimed and rendered in excess of these amounts and may be settled and paid pursuant to this Act up to $50,000 or $100,000, as the case may be, and that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature. The limitations of liability set forth in this subsection shall apply to the state and its agencies and subdivisions whether or not the state or its agencies or subdivisions possess sovereign immunity prior to July 1, 1974.

.　　.　　.　　.　　.

(9)(a) No officer, employee, or agent of the state or its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injuries or damages suffered as a result of any act, event, or omission of action in the scope of his employment or function,

unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The exclusive remedy for injury or damages suffered as a result of any act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional offices shall be by action against governmental entity, or the head of such entity in his official capacity, or the constitutional office of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property. The state or its subdivision shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property....

Fla.Stat. § 768.28 (Supp.1980).

The Southern District Court in *Brooks v. Parker*, No. 80–2258–Civ–SMA, found that the State of Florida had consented to suit under the federal civil rights statutes and had waived its Eleventh Amendment immunity, by concluding that the words "wrongful act or omission" found in Section 768.-28(1) includes violations of federal civil rights. The court in *Brooks* then coupled this interpretation with the *Marrapese* court's novel extrapolation which permits constitutional deprivations which are tortious at common law, or analogous to a common law tort, to be labeled and included as tortious conduct subject to statutory waivers of sovereign immunity. As more fully discussed below, the language of Section 768.28 and related statutes as well as their legislative histories do not support the conclusion that immunity is waived in these federal actions.

Section 768.28 specifically provides that the State of Florida waives "sovereign immunity for liability for *torts.*" Florida Statute § 768.28(1). Damages in *tort* can be recovered against the state "for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee" of a state agency or subdivision. *Id.* Significantly, Section 768.28 notes that the tort action against the state may only be prosecuted only "if a private person, [sic] would be liable to the claimant in accordance with *the general laws of this state, . . .*" *Id.* (Emphasis added.) Section 768.28 specifically refers to the laws of the State of Florida, not federal laws.

Section 768.28(5) sets the limits on the monetary amounts a claimant may recover against the State of Florida. This subsection reiterates that the "state and its agencies and subdivisions shall be liable for *tort* claims. . . ." *Id.* The recovery limits specified in this subsection are the subject of other related Florida statutes, and when these related statutes are examined *in pari materia*, it is evident that Section 768.28 waives sovereign immunity only for state tort actions and should not be construed to waive sovereign immunity for federal civil rights actions.

Under Chapter 284, Part 2, Florida Statutes (1979), the Florida Casualty Insurance Risk Management Trust Fund is created and the scope and types of coverages are specified. Specifically, Section 284.30, Florida Statutes, provides:

There is created a Florida Casualty Insurance Risk Management Trust Fund to provide insurance, as authorized by s. 284.33, for workers' compensation, general liability, fleet automotive liability, federal civil rights actions under 42 U.S.C. s. 1983, or similar federal statutes, and court-awarded attorney's fees in other proceedings against the state except for such awards in emminent domain or for inverse condemnation or to awards by the Career Service Commission. A party to a

suit in any court, to be entitled to have his attorney's fees paid by the state or any of its agencies, must serve a copy of the pleading claiming the fee on the Department of Insurance, and thereafter the Department shall be entitled to participate with the agency in the defense of the suit and any appeal thereof with respect to such fees.

Fla.Stat. § 284.30 (1979). Additionally, Section 284.31 states:

The Insurance Risk Management Trust Fund shall, unless specifically excluded by the Department of Insurance, cover all departments of the State of Florida, and their employees and agents and other authorized persons, and shall provide separate accounts for workers' compensation, general liability, fleet automotive liability, federal civil rights actions under 42 U.S.C. s. 1983, or similar federal statutes, and court-awarded attorney's fees in other proceedings against the state except for such awards in emminent domain or for inverse condemnation or to awards by the Career Service Commission.

Fla.Stat. § 284.31 (1979).

The most significant provision of Chapter 284, Part 2, is Section 284.38 which is entitled "Waiver of sovereign immunity; effect":

The insurance programs developed herein shall provide limits as established by the provisions of s. 768.28 if a tort claim. *The limits provided in s. 768.28 shall not apply to a civil rights action arising under 42 U.S.C. s. 1983 or similar federal statute.* Payment of a pending or future claim or judgment arising under any of said statutes may be made upon this act becoming a law, unless the officer, employee or agent has been determined in the final judgment to have caused the harm intentionally; however, the fund is authorized to pay all other court-ordered attorney's fees as provided under s. 284.-31.

Fla.Stat. § 284.38 (1979). (Emphasis added) Thus, by the plain language of Section 284.-

38, federal civil rights actions are distinctly excluded from the realm of tort claims for which sovereign immunity is waived under Section 768.28, since the recovery limits, a specific restriction without which the State of Florida certainly would not waive its sovereign immunity, specifically does not apply to civil rights actions.

Arguably, Section 284.38 could be interpreted, under a very broad construction, to effectively expand the scope of the waiver of sovereign immunity specified in Section 768.28 to include federal civil rights actions, with the usual conditions limiting recovery amounts abrogated. However, it seems logical that any expansion of the scope of the waiver would more appropriately be contained in Section 768.28 instead of a chapter related to state insurance programs. Clearly, Section 768.28 on its face does not specifically address federal civil rights suits. Furthermore, the Florida legislature in 1979 specifically deleted language from Section 768.28 which previously lent itself to the interpretation that federal civil rights suits could come under the ambit of the waiver of sovereign immunity for torts. Section 9, Chapter 79–139, Florida Laws, amended Section 768.28 as follows:

Subsection (9) of section 768.28, Florida Statutes, is amended to read:

768.28 Waiver of sovereign immunity in tort claims; recovery limit; limitation on attorney's fees; statute of limitations; exclusions.—(9) No officer, employee, or agent of the State or its subdivisions shall be held personally liable in tort <u>for a final judgment which has been rendered against him</u> for any injuries or damages suffered as a result of any act, event, or omission of action in the scope of his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard to human rights, safety, or property. ~~Subject to the monetary limitations set forth in Subsection (5), the state shall pay any monetary judgment which is ren-~~

dered in a civil action personally against an officer, employee, or agent of the state which arises as a result of any act, event, or omission of action within the scope of his employment or function.

.    .    .    .    .

CODING: words in struck through type are deletions from existing law; words in underscored type are additions.

This amendment to Section 768.28 was part of a package of revisions, amendments, and new statutes enacted in 1979 to clarify the applicability of Florida's waiver of sovereign immunity for tort claims and liability coverage under state insurance programs. It is readily apparent that this amendment underscores the intent of the Florida legislature to distinguish between tort claims and other civil suits, which would, of course, include federal civil rights actions. This legislative intent is also documented in the Florida Senate Staff Analysis on Committee Substitute for Senate Bill 332, eventually enacted as Senate Bill 474, Chapter 79–139, Florida Laws:

(8) S. 768.28(9) F.S., is amended to delete language that monetary limits of s. 768.28 shall apply to *any* civil actions. Such monetary limits shall still apply to final judgments in tort.

*Senate Staff Analysis and Economic Impact Statement on Committee Substitute, Senate Bill 332,* ¶ I.B(8) (May 14, 1979). (Emphasis added.)

The essence of Section 284.38, as its title and text indicate, is that the Section 768.28 waiver of sovereign immunity simply does not apply to federal civil rights actions. The legislative histories of Sections 284.30, 284.31, and, especially 284.38, support this construction. The basis for enactment of these revisions to Chapter 284, Florida Statutes, was solely to provide "coverage through the Casualty Insurance Risk Management Trust Fund to include federal civil rights actions." *Fiscal Note on Committee Substitute, House Bill 1278, Committee on Appropriations, State of Florida House of Representatives,* ¶ I.D (May 28, 1979). These statutory revisions were intended to correct deficiencies in the state insurance programs which in May, 1979, failed to provide coverage for federal civil rights lawsuits brought against an employee of the State of Florida:

Civil rights law suits brought against an employee of the state or its political subdivision under 42 U.S.C., s. 1983 or similar federal statute are not presently covered by the Florida Statutes. There is no specific authority, as there is for tort actions, for the Attorney General to defend employees in such actions. The present scope of the insurance provided by the Division Risk Management does not allow for coverage against payments arising from such suits. Political subdivisions of the state are not authorized to make payments arising from such suits or to purchase such insurance. Section 768.28, F.S., provides for maximum payments of $50,000 per claim and $100,000 per incident in civil actions. These limits cannot apply to civil rights actions under 42 U.S.C., s. 1983. The Division of Risk Management cannot now insure against court ordered payment of attorney's fees in civil rights cases brought under 42 U.S.C., [sic] s. 1983.

*Florida Senate Staff Analysis and Economic Impact Statement On Committee Substitute, Senate Bill 332,* ¶ I.A (May 14, 1979).

The Florida Senate staff also expressed the intended effect of the proposed changes to Chapter 284, Florida Statutes:

(4) S. 284.30, F.S., is amended to broaden the coverages to be provided by the Florida Casualty Insurance Risk Management Trust Fund to include the payment of judgment and court ordered payment of attorney's fees in federal civil rights actions under 42 U.S.C., s. 1983, or similar federal statutes.

(5) S. 284.31, F.S., is amended to include within the scope of coverages of the Insurance Risk Management Trust Fund the payment of judgments of court or-

dered payment of attorney's fees in federal civil rights actions under 42. [sic] U.S.C., s. 1983 or similar federal statutes.

.   .   .   .   .

(7) S. 284.38, F.S., is amended to provide that for a tort claim, the insurance programs developed in Chapter 284. [sic] part II, shall be subject to the monetary limits in s. 768.28, F.S. * if the claim arises from a civil rights action under 42 U.S.C., s. 1983, or similar federal statute, the limits in s. 768.26, F.S., shall not apply.

_____
\* ($50,000 per claim and $100,000 per incident).

*Id.* at ¶ I.B. The Florida House of Representatives Committee on Judiciary also provided an analysis of the proposed, and later enacted, amendments to Section 284.38:

This section provides that action in tort shall continue to be limited by the provisions of 768.28, F.S. However, judgments or settlements in civil rights actions or covered court awarded attorney's fees shall not be limited. Coverage is provided on all pending civil rights cases.

*Analysis of Committee Substitute for House Bill 1278, Florida House of Representatives Committee on Judiciary,* § 8 (1979).

Further support for the conclusion that the State of Florida has not waived its sovereign immunity under the Eleventh Amendment for federal civil rights suits is found in Chapter 111, Florida Statutes. In order to ensure consistency between statutes concerning related subject matter and also in order to provide representation for individual employees, officers, or agents of the State of Florida in defense of federal civil rights cases instituted against them, the Florida Legislature in 1979 amended Section 111.07 and created Section 111.071. Section 111.07, Florida Statutes (Supp. 1980), provides:

*Defense of civil actions against public officers, employees, or agents.*—Any agency of the state, or the county, municipality, or political subdivision of the state, is authorized to provide an attorney to defend any civil action arising from a complaint for damages or injuries suffered as a result of any act or omission of action of any of its officers, employees, or agents for an act or omission arising out of and in the scope of his employment or function, unless, in the case of a tort action, the officer, employee, or agent acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. Defense of such civil actions shall include, but not be limited to, any civil rights lawsuit seeking relief *personally* against the officer, employee, or agent for an act or omission under color of state law, custom, or usage, *wherein it is alleged that such officer, employee, or agent has deprived another person his rights secured under the federal Constitution or laws.* Legal representation of an officer, employee, or agent of a state agency may be provided by the Department of Legal Affairs. If any agency of the state or any county, municipality, or political subdivision of the state is authorized pursuant to this section to provide an attorney to defend a civil action arising from a complaint for damages or injuries suffered as a result of any act or omission of action of any of its officers, employees or agents, and fails to provide such an attorney, then said agency, county, municipality, or political subdivision shall reimburse any such defendant who prevails in the action for court costs and reasonable attorney's fees.

(Emphasis in text added.)

Section 111.071, Florida Statutes (Supp. 1980), states in pertinent part:

*Payment of judgments or settlements against certain public officers or employees.*—

(1) Any county, municipality, political subdivision, or agency of the state which has been excluded from participation in the Insurance Risk Management Trust Fund is authorized to expend available funds to pay:

(a) any final judgment, including damages, costs, and attorneys' fees, arising from a complaint for damages or injuries suffered as a result of any act or omission of action of any officer, employee, or agent in a civil or civil rights law suit described in s. 111.07. If the civil action arises under s. 768.28 as a tort claim, the limitations and provisions of s. 768.28 governing payment shall apply. If the action is a civil rights action arising under 42 U.S.C. s. 1983, or similar federal statutes, payments for the full amount of the judgment may be made unless the officer, employee, or agent has been determined in the final judgment to have caused the harm intentionally.

.     .     .     .     .

(4) *This section is not intended to be a waiver of sovereign immunity or a waiver of any other defense or immunity to such lawsuits.*

(Emphasis in text added.)

Clearly, on their face, Sections 111.07 and 111.071 substantiate the conclusion that neither Section 768.28 by itself, or coupled with Chapter 284, should be construed as a waiver of Eleventh Amendment immunity by the State of Florida. Additionally, the legislative histories of Sections 111.07 and 111.071 also support this conclusion:

(1) S. 111.07, F.S., is broadened to allow the State or its subdivision to defend an employee in any civil action arising out of the scope of employment. Defense of such civil actions shall include but not be limited to civil rights lawsuits. The Department of Legal Affairs may provide such legal representation.

(2) S. 111.071, F.S., is created to authorize a political subdivision of the State or a State agency excluded from participating in the Insurance Risk Management Trust Fund to pay final personal judgments against employees in civil or civil rights lawsuits. If the civil action arises under s. 768.26 [768.28], the monetary limitation of that section apply [sic]. If it is a civil rights action under 42 U.S.C., s. 1983, payment may be in full.

*Florida Senate Staff Analysis and Economic Impact Statement on Committee Substitute, Senate Bill 332*, ¶ I.B (May 14, 1979). The House Committee on Judiciary enounced:

This amendment applies only to civil cases, not criminal prosecutions. The amendment accomplishes three things:

1. It allows the agency to provide an attorney to represent an officer or employee when sued under the federal civil rights Act both for damages and injunctive relief. The specific reference to civil rights suits is needed because (a) these are not "torts" and (b) though they arise under "color of state law," it is not clear whether such cases involve actions "in scope of employment." The deletion of the exception for allegations of "malice, bad faith, etc." in the case of a federal civil rights lawsuit is essential. A federal civil rights suit under 42 U.S.C. § 1983 cannot obtain damages *unless* these allegations are made. If any exception is to be made, it may be where the officer or employee has clearly acted intentionally to cause harm to others. The draft does not contain this exception, however.

2. The amendment further provides authorization for local governments as well as the state to provide a defense for [section] 1983 and other civil actions.

.     .     .     .     .

This section creates a new statute [Section 111.071] authorizing local governments and certain state agencies to pay both tort and [Section] 1983 judgments against their officers and employees, subject to certain exceptions.

*Analysis of Committee Substitute for House Bill 1278, Florida House of Representatives Committee on Judiciary*, §§ 1, 2 (1979). The distinctions specifically made by the above-quoted legislative histories between tort claims and federal civil rights suits affirmatively demonstrate that the Florida legislature considers federal civil rights suits as civil actions separate from those civil tort suits which come under the ambit of the waiver of sovereign immunity in Section 768.28. Indeed, the clear and

unambiguous language of Section 111.071(4) affirmatively evinces the intent of the State of Florida not to have the statute construed as a waiver of sovereign or any other available immunity.

This distinction between tort claims and federal civil rights claims is furthermore confirmed by noting the differing procedures contemplated by the Florida Statutes for bringing these claims to court. Under Section 768.28, the tort claims against an employee, officer, or agent of the state may only be maintained by naming the state or agency as the party against whom the action is brought. The officer, employee, or agent of the state will not be held personally liable. Fla.Stat. § 768.28(9)(a) (Supp. 1980). Bringing suit against the state instead of the employee is a condition of the waiver of sovereign immunity in tort actions by the State of Florida. In contrast, the applicable statutory provisions in Chapters 111 and 284, concerning the defense by the State of Florida in federal civil rights actions, address civil rights lawsuits brought against the *individual* officer, employee, or agent which seek relief *personally* against them. Nowhere in the scheme of the insurance coverage for civil rights claims is there the condition that the state or its agencies be sued in place of the officer, employee, or agent. Indeed, attorney representation and authorization for payment of damages from the Insurance Risk Management Trust Fund are only and specifically provided when an officer, employee, or agent is sued individually or personally.

Finally, it is also noted that the language in Sections 284.30 and 284.31 which permits payment by the state of court-awarded attorney's fees "in other proceedings against the state" establishes that the state has consented to payment of attorney's fees from its treasury in federal civil rights suits against the state. Arguably, it could be concluded under a rather broad construction, that the State of Florida by this clause has consented to suit under federal civil rights statutes. However, it is clear that these statutory provisions are simply legislative enactments reiterating the United States Supreme Court's holding in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), which declared that by enacting the Civil Rights Attorney's Fees Award Act of 1976, now codified as 42 U.S.C. § 1988, Congress intended to override the Eleventh Amendment immunity of the states and authorize attorney's fees payable by the states.

In conclusion, then, the express language of Section 768.28, and related statutes in Chapters 111 and 284, Florida Statutes, affirmatively shows that the State of Florida has not waived its Eleventh Amendment immunity. Similarly, the legislative history of those statutes clearly demonstrates that it was neither the intent nor the desire of the Florida legislature to waive the Eleventh Amendment immunity by enactment of those statutes. Therefore, partial summary judgment in favor of the defendants Graham and Taylor should be entered. All claims for damages against the defendants being sued in their official capacities should be stricken, while the claims for declaratory and injunctive relief should remain standing.

## III. PENDENT STATE TORT CLAIM

In their amended complaint, the plaintiffs have raised pendent state tort claims against the defendants. The defendants have moved for dismissal of these state tort claims on the ground that inasmuch as the plaintiffs have failed to comply with conditions precedent to waiver by the State of Florida of its sovereign immunity from damages allegedly attributable to state officials, the State of Florida has not consented to suit in tort in this case, and the plaintiffs' tort claims are barred by the doctrine of sovereign immunity.

As noted previously, Section 768.28, Florida Statutes, establishes procedures for bringing claims of tortious conduct against state officials before state agencies for administrative consideration as a prerequisite to the state's consent to be sued in court for tort claims. Fla.Stat. § 768.28(6) (Supp. 1980). The plaintiffs concede that this pro-

cedural requirement has not been met by them. Therefore, the undersigned concludes that the plaintiffs' failure to comply with the conditions precedent to waiver by the State of Florida of its sovereign immunity now bars bringing suit for pendent state tort claims in this federal court. Therefore, the pendent state tort claims against the defendants must be dismissed and stricken from the amended complaint.

Accordingly, in view of the foregoing, it is now

ORDERED:

1. The defendants' motion to dismiss for failure to exhaust administrative remedies should be, and the same is hereby, denied. The defendants' third affirmative defense is hereby stricken.

2. The parties are directed to conduct discovery so that the due date of any discovery requested shall not be later than January 8, 1982. The conduct of any discovery which would require a later due date shall be permitted only by order of the court. No extension of time will be granted except for good cause and upon a showing of diligence during the initial discovery period. *See* Local Rule 11.

3. Counsels' attention is directed to the provisions of Rule 68, Federal Rules of Civil Procedure (Offer of Judgment) and Title 28, United States Code, Section 1927 (Counsel's Liability for Excessive Costs).

4. Pursuant to 28 U.S.C. § 636(b)(1) and in accordance with Local Rule 30(B), Rules for the United States District Court for the Northern District of Florida, the parties to this action may serve and file written objections to the following recommendation within ten (10) days of the date hereof. Failure to object to the following recommendation prior to the district court's adoption of the recommendation constitutes and serves as a waiver of the right to appeal any recommendation accepted and adopted by the district court. *Nettles v. Wainwright*, 656 F.2d 986 (5th Cir. 1981); *United States v. Lewis*, 621 F.2d 1382 (5th Cir. 1980).

It is further respectfully RECOMMENDED:

The defendants' motion for partial summary judgment (document 28) should be granted, and all claims for damages against the defendants should be stricken from the plaintiffs' amended complaint.

On Motion For Reconsideration

This matter comes on for consideration upon the defendants' motion for reconsideration and/or for relief from order (document 41). *See* Fed.R.Civ.P. 60. The defendants contend that the court's order denying their motion to dismiss this civil rights action for failure to exhaust administrative remedies should be vacated and that dismissal is warranted since contrary to the court's prior ruling on the issue of exhaustion, the defendants assert, the decisional law of Florida courts has established that the Florida Administrative Procedures Act (FAPA) provides an adequate and available administrative mechanism for determining and resolving constitutional issues. Therefore, the defendants submit, under the standards delineated by the Fifth Circuit in *Patsy v. Florida International University*, 634 F.2d 900 (5th Cir. 1981), an adequate and available administrative remedy exists which would require exhaustion by the plaintiffs before their civil rights claims could be entertained by this court.

After deciding that procedures under the FAPA could not resolve constitutional claims raised in a 42 U.S.C. § 1983 action and upon concluding that exhaustion would not be required, the Fifth Circuit in *Curtis v. Taylor*, 648 F.2d 946 (5th Cir. 1980), noted:

We recognize the possibility that Florida courts might, in the future, construe the Administrative Procedures Act to confer power to consider both statutory and constitutional claims.

*Id.* at 948 n. 4. The defendants claim that the Florida First District Court of Appeal in *Rice v. Department of Health and Rehabilitative Services*, 386 So.2d 844 (Fla. 1st Dist.Ct.App.1980), and in *Kee Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund*, 400 So.2d 66 (Fla. 1st Dist.Ct.App.1981),

found the procedures of the FAPA sufficient to consider constitutional issues. As the plaintiffs properly suggest, the defendants' reliance on these two cases to support their position is misplaced; indeed, the decisions in *Rice* and *Kee Haven* lend further support to this court's prior conclusion that the FAPA does not provide an adequate administrative remedy requiring exhaustion.

In both *Rice* and *Kee Haven*, the Florida First District Court of Appeal addressed the issue of raising constitutional questions in an action collateral to an administrative procedure. The facial constitutionality of a rule was at issue in *Rice*, while in *Kee Haven*, allegedly unconstitutional conduct was considered. While the Florida appellate court held in both cases that the aggrieved parties should have raised their constitutional issues in the administrative proceedings, the court did not rule that an administrative hearing officer had the capacity or authority to decide constitutional issues. The First District Court of Appeal declared that any decision on constitutional issues would be made only by a Florida district court of appeal after exhaustion of state administrative remedies and upon direct appellate review pursuant to the FAPA, not by a collateral attack in a court action outside the sequential administrative hearing and judicial review procedures of the FAPA.

If the defendants are contending that under the holdings in *Rice* and *Kee Haven* the plaintiffs must first raise their Section 1983 claim in state administrative proceedings, holding in abeyance and deferring determination of their constitutional claims until after the claims are presented for judicial review on appeal pursuant to the FAPA, then the defendants' contention misses the mark. First, deferment of consideration and determination of the constitutional issues until the claims can be reviewed on appeal fails to meet the *Patsy* "minimum standards" that relief from the *administrative agencies* must be available within a reasonable time; that the *administrative agencies* must be able to grant relief more or less commensurate with the relief sought by the Section 1983 claims; and that

interim relief must be available through the *administrative agencies*. *Patsy*, 634 F.2d at 912–13. Second, the defendants' contention, in essence, would require the plaintiffs to exhaust state judicial review of their Section 1983 claim prior to bringing this action in federal court; requiring exhaustion of available state judicial remedies in Section 1983 has been expressly rejected by the courts. *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492, 503 (1961); *McNeese v. Board of Education*, 373 U.S. 668, 672, 83 S.Ct. 1433, 1436, 10 L.Ed.2d 622, 625 (1963); *Ellis v. Dyson*, 421 U.S. 426, 432–33, 95 S.Ct. 1691, 1695, 44 L.Ed.2d 274, 281–82 (1975); *Preiser v. Rodriguez*, 411 U.S. 475, 477, 93 S.Ct. 1827, 1830, 36 L.Ed.2d 439, 443 (1973); *Patsy*, 634 F.2d at 904–05; *Curtis*, 648 F.2d at 949.

In view of all of the foregoing, the motion for relief from the court's order denying dismissal must be denied as without merit. Accordingly, it is now

ORDERED:

The motion for reconsideration should be, and the same is hereby, granted. Upon reconsideration, the court's order entered on October 9, 1981, denying dismissal of this action shall stand. The motion for relief from that order therefore should be, and the same is hereby, denied.