FLORIDA DEPARTMENT OF HEALTH AND REHA-
BILITATIVE SERVICES ET AL. *v.* FLORIDA
NURSING HOME ASSOCIATION ET AL.

No. 80–532. Decided March 2, 1981

PER CURIAM.

Petitioners, the Florida Department of Health and Re-
habilitative Services and its Secretary, seek review of a deci-
sion of the United States Court of Appeals for the Fifth
Circuit ordering them to make payments to various nursing
homes. These payments represent the amount that Florida
was found to have underpaid these nursing homes in the
course of its Medicaid reimbursements from July 1, 1976, to
October 18, 1977. Because we conclude that the court below
misapplied the prevailing standard for finding a waiver of the
State's immunity under the Eleventh Amendment, we grant
a writ of certiorari and reverse.

## I

In 1972, Congress amended the Medicaid Program to provide that every "skilled nursing facility and intermediate care facility" must be reimbursed by participating States on a "cost related basis." 86 Stat. 1426, 42 U. S. C. § 1396a (a) (13)(E). This amendment was to take effect on July 1, 1976, *ibid.*, and had the effect of altering some reimbursement arrangements based on "flat rates" established by the States. Regulations implementing this change were not promulgated by the Department of Health, Education, and Welfare (HEW) until 1976. As a result, the regulations provided that HEW would not enforce the new "cost related" reimbursement requirement until January 1, 1978. 45 CFR § 250.30 (a)(3)(iv) (1976).[1]

In March 1977, respondents, an association of Florida nursing homes and various individual nursing homes in southern Florida, brought suit in federal court against the Secretary of HEW and petitioners. They argued that the delay in enforcement created by the implementing regulations was inconsistent with the statutory directive that cost-related reimbursements begin on July 1, 1976. In addition to prospective relief, they sought retroactive relief in the form of payments by the State of the difference between the reimbursement they had received since July 1, 1976, and the amounts they would have received under a cost-related system. The United States District Court for the Southern District of Florida held the regulations invalid, relying on its previous decision in *Golden Isles Convalescent Center, Inc.* v. *Califano,* 442 F. Supp. 201 (1977), aff'd, 616 F. 2d 1355 (CA5), cert. denied *sub nom. Taylor* v. *Golden Isles Con-*

---

[1] In a commentary accompanying the new regulations, the Secretary noted that no States would be able to accumulate needed data in time to meet the statutory deadline of July 1, 1976. For this reason, cost-related reimbursement was not required under the regulations until January 1, 1978, but the States were "encouraged to meet each requirement of the regulations as soon as possible." 41 Fed. Reg. 27305 (1976).

*valescent Center, Inc.,* 449 U. S. 872 (1980). These two cases were consolidated for consideration of the availability of retroactive relief, and the District Court held that such relief was barred by the Eleventh Amendment.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the ruling that the regulations were invalid, but reversed the District Court's determination that retroactive relief was barred by the Eleventh Amendment. 616 F. 2d 1355 (1980).[2] The court acknowledged that retroactive monetary relief against a State in federal court is forbidden by the Eleventh Amendment "if not consented to by the state." *Id.,* at 1362. It found the requisite consent, however, based on two acts of the State. First, Florida law provides that the Department of Health and Rehabilitative Services is a "body corporate" with the capacity to "sue and be sued," Fla. Stat. § 402.34 (1979). 616 F. 2d, at 1363. In addition to this general waiver of sovereign immunity, the court found a specific waiver of the Eleventh Amendment's immunity from suit in federal court in an agreement under the Medicaid Program in which the Department agreed to "recognize and abide by all State and Federal Laws, Regulations, and Guidelines applicable to participation in and administration of, the Title XIX Medicaid Program." *Ibid.* "By contracting with appellants to be bound by all federal laws applicable to the Medicaid program, the state has expressly waived its Eleventh Amendment immunity and consented to suit in federal court regarding any action by providers alleging a breach of these laws." *Ibid.*

## II

The analysis in this case is controlled by our decision in *Edelman* v. *Jordan,* 415 U. S. 651 (1974). There we applied

---

[2] The *Golden Isles* case and this case remained consolidated on appeal. The decision below, however, produced two separate petitions for certiorari. The first, *Taylor* v. *Golden Isles Convalescent Center, Inc.,* cert. denied, 449 U. S. 872 (1980), involved jurisdictional and venue issues. The present petition relates only to the availability of retroactive relief.

the Eleventh Amendment to retroactive grants of welfare benefits and discussed the proper standard for a waiver of this immunity by a State. On the latter issue we stated that "we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Id.*, at 673, quoting *Murray* v. *Wilson Distilling Co.*, 213 U. S. 151, 171 (1909). We added that the "mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts." 415 U. S., at 673.

The holding below, finding a waiver in this case, cannot be reconciled with the principles set out in *Edelman*. As the Court of Appeals recognized, the State's general waiver of sovereign immunity for the Department of Health and Rehabilitative Services "does not constitute a waiver by the state of its constitutional immunity under the Eleventh Amendment from suit in federal court." 616 F. 2d, at 1363. See *Smith* v. *Reeves*, 178 U. S. 436, 441 (1900). And the fact that the Department agreed explicitly to obey federal law in administering the program can hardly be deemed an express waiver of Eleventh Amendment immunity. This agreement merely stated a customary condition for any participation in a federal program by the State, and *Edelman* already established that neither such participation in itself, nor a concomitant agreement to obey federal law, is sufficient to waive the protection of the Eleventh Amendment.[3] 415 U. S., at 673–674.

We therefore reverse the decision below.

*It is so ordered.*

---

[3] Petitioners argue that under Florida law a waiver of immunity can only be accomplished by a state statute. See Fla. Const., Art. 10, § 13. No such waiver is present here.

In addition, it is worth noting that in October 1976 Congress repealed

JUSTICE MARSHALL dissents and would affirm the judgment of the Court of Appeals, substantially for the reasons stated in his dissent in *Edelman* v. *Jordan,* 415 U. S. 651, 688 (1974).

JUSTICE BLACKMUN also dissents and would affirm the judgment of the Court of Appeals substantially for the reasons stated in JUSTICE MARSHALL's dissent in *Edelman* v. *Jordan,* 415 U. S. 651, 688 (1974).

JUSTICE STEVENS, concurring.

The decision of the Court of Appeals is in square conflict with this Court's holding in *Edelman* v. *Jordan,* 415 U. S. 651. Apparently recognizing this fact, respondents urge the Court to grant certiorari and hear argument on the question whether *Edelman* should be overruled.[1] I find this question less easily answered than do my Brothers, all of whom were Members of the Court when *Edelman* was decided. Each has voted today consistently with his vote in *Edelman* itself.

The arguments in favor of overruling *Edelman* are appealing, particularly because I share the opinion of JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN that *Edelman* was incorrectly decided.[2] I have previously relied

a provision requiring States participating in Medicaid to waive their Eleventh Amendment immunity. Pub. L. 94–552, 90 Stat. 2540. This repeal was made retroactive to January 1, 1976.

[1] Respondents initially argued that the Court of Appeals' decision was distinguishable from *Edelman* and that certiorari therefore should be denied. However, after the Solicitor General, on behalf of the Secretary of Health and Human Services, recommended that the Court grant certiorari and summarily reverse the lower court's decision, respondents requested that the Court instead grant certiorari and consider overruling *Edelman.* See Supplemental Brief for Respondent Nursing Homes 4–13.

[2] In 1972, I sat as a member of a three-judge District Court that rejected essentially the same Eleventh Amendment argument that the Court accepted in *Edelman.* See *Mothers and Childrens Rights Organization* v. *Sterrett,* No. 70 F. 138 (ND Ind., Apr. 14, 1972), summarily aff'd, 409

on rather slender grounds for distinguishing *Edelman*,[3] when wiser judges might have forthrightly urged rejection of the precedent.[4] And I joined the Court's decision to overrule *Monroe* v. *Pape*, 365 U. S. 167, insofar as it concerned the financial responsibility of municipal corporations. See *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 714 (STEVENS, J., concurring in part). Moreover, the reflections of some former Members of the Court on the doctrine of *stare decisis* suggest that they would not have hesitated to overrule a decision that stands as an impediment to providing an adequate remedy for citizens injured by their government.[5] Nevertheless, I find greater force in the countervailing arguments.

First, I would note that *Edelman* did not announce a rule of law fundamentally at odds with our current understanding of the scope of constitutionally protected civil rights,[6]

---

U. S. 809; cited in *Edelman*, 415 U. S., at 670, n. 13. I am therefore quite certain that I would have joined JUSTICE MARSHALL's dissent if I had been a Member of the Court when *Edelman* was decided.

[3] See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 458–460 (STEVENS, J., concurring).

[4] In his 1949 Cardozo lecture, Justice Douglas stated:

"The idea that any body of law, particularly public law, should appear to stay put and not be in flux is an interesting phenomenon that Frank has explored in *Law and the Modern Mind*. He points out how it is—in law and in other fields too—that men continue to chant of the immutability of a rule in order to 'cover up the transformation, to deny the reality of change, to conceal the truth of adaptation behind a verbal disguise of fixity and universality.' But the more blunt, open, and direct course is truer to democratic traditions. It reflects the candor of Cardozo. The principle of full disclosure has as much place in government as it does in the market place. A judiciary that discloses what it is doing and why it does it will breed understanding. And confidence based on understanding is more enduring than confidence based on awe." W. Douglas, Stare Decisis 30–31 (1949) (footnote omitted).

[5] See W. Douglas, *supra;* A. Goldberg, Equal Justice: The Warren Era of the Supreme Court 67–97 (1971).

[6] Cf. *Brown* v. *Board of Education*, 347 U. S. 483, 489–495, overruling *Plessy* v. *Ferguson*, 163 U. S. 537.

nor did it rest upon a discredited interpretation of the relevant historical documents.[7] Rather, the rule of the *Edelman* case is of only limited significance and has been a part of our law for only a few years. Its limiting effect on the jurisdiction of federal courts is not so restrictive that Congress may not mitigate its impact by unambiguously conditioning state participation in federal programs on a waiver of the Eleventh Amendment defense. The *Edelman* rule represents an interpretation of the Eleventh Amendment that had previously been endorsed by some of our finest Circuit Judges;[8] it therefore cannot be characterized as unreasonable or egregiously incorrect.[9]

Of even greater importance, however, is my concern about the potential damage to the legal system that may be caused by frequent or sudden reversals of direction that may appear to have been occasioned by nothing more significant than a change in the identity of this Court's personnel.[10] Granting that a zigzag is sometimes the best course,[11] I am firmly convinced that we have a profound obligation to give recently decided cases the strongest presumption of validity. That

---

[7] Cf. *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 71–73, overruling *Swift* v. *Tyson*, 16 Pet. 1.

[8] The opinion in *Rothstein* v. *Wyman*, 467 F. 2d 226, 228 (CA2 1972), which adopted the interpretation of the Eleventh Amendment subsequently approved by this Court in *Edelman*, was written by Judge McGowan (sitting by designation) and was joined by Chief Judge Friendly and Judge Timbers. See 415 U. S., at 664–665, 666, n. 11.

[9] The principal justifications for refusing to apply the doctrine of *stare decisis* in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658; see *id.*, at 695–701, are therefore not available in this case.

[10] Scholars have suggested that the identity of the Court's personnel was a factor underlying the decision in *National League of Cities* v. *Usery*, 426 U. S. 833, 853–855, to overrule *Maryland* v. *Wirtz*, 392 U. S. 183. See, *e. g.*, J. Nowak, J. Young, & R. Rotunda, Constitutional Law 159–163 (1978).

[11] See, *e. g.*, *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, overruling *Minersville School District* v. *Gobitis*, 310 U. S. 586.

presumption is supported by much more than the desire to foster an appearance of certainty and impartiality in the administration of justice, or the interest in facilitating the labors of judges.[12] The presumption is an essential thread in the mantle of protection that the law affords the individual. Citizens must have confidence that the rules on which they rely in ordering their affairs—particularly when they are prepared to take issue with those in power in doing so— are rules of law and not merely the opinions of a small group of men who temporarily occupy high office.[13] It is the unpopular or beleaguered individual—not the man in power— who has the greatest stake in the integrity of the law.[14]

---

[12] These concerns are not, however, insubstantial:

"[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." B. Cardozo, The Nature of the Judicial Process 149 (1921).

[13] This, of course, is not a novel suggestion. As the first Justice White noted in his dissent in *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 652:

"The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people."

[14] THE CHIEF JUSTICE recently reminded us of this fact by quoting a statement ascribed to Sir Thomas More:

"This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then? . . . Yes, I'd give the Devil benefit of law, for my own safety's sake." See *TVA* v. *Hill*, 437 U. S. 153, 195, quoting R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967).

For me, the adverse consequences of adhering to an arguably erroneous precedent in this case are far less serious than the consequences of further unravelling the doctrine of *stare decisis*. I therefore join the Court's disposition.

JUSTICE BRENNAN, dissenting.

I dissent and would affirm the judgment of the Court of Appeals. This suit is brought by Florida citizens against Florida officials. In that circumstance I am of the view, expressed in dissent in *Edelman* v. *Jordan,* 415 U. S. 651, 687 (1974), that Florida "may not invoke the Eleventh Amendment, since that Amendment bars only federal court suits against States by citizens of other States."