**Faye GULLEDGE, as Administratrix of the Estate of David Gulledge, Jr., for the Estate and for the benefit of herself and David Gulledge, Sr., Plaintiff,**

**v.**

**Joe A. SMART and J. Elbert Pope, Sheriff of York County, and John Hunsucker, Defendants.**

**Civ. A. No. 0:87–782–16.**

United States District Court, D. South Carolina, Rock Hill Division.

July 29, 1988.

Ray P. McClain, Charleston, S.C., for plaintiff.

William H. Davidson, II, Columbia, S.C. for J. Elbert Pope.

Robert R. Carpenter, Rock Hill, S.C., for John Hunsucker.

Terry B. Millar, Rock Hill, S.C., for Joe A. Smart.

### ORDER

HENDERSON, District Judge.

This matter is before the Court on the defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiff has brought this action under 42 U.S.C. § 1983 alleging deprivation of her decedent's life without due process of law, together with pendent state claims arising under the South Carolina wrongful death and survivorship statutes. For the reasons set forth below, the Court grants the defendants' motion.

### I.

On motion for summary judgment, the Court must view the facts and inferences reasonably to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Viewed in the light most favorable to the plaintiff, the record reveals the following facts.

The plaintiff's decedent, David Gulledge, Jr., was killed on September 4, 1985, by Richard Jackson, a deputy sheriff appointed by the York County Sheriff. For several weeks before the killing, Jackson showed signs of depression at work such as acting in a withdrawn manner and, on more than one occasion, breaking down in tears. The sheriff's department as a whole was unusually tense at that time because the sheriff, defendant J. Elbert Pope, was under suspension and the deputies generally were uncertain of the security of their jobs. It was also commonly known that Jackson and his wife were having marital difficulties. On approximately August 25, 1985, Lynn Jackson told her husband that she intended to leave him.

While there is no evidence that Jackson demonstrated violent tendencies at work, Jackson was involved in one incident of domestic violence and threatened suicide. On approximately August 29, 1985, Jackson came home late at night, awakened his wife, handcuffed her and forced her outside. Once outside, he handcuffed her to himself and, with a gun in his hand, threatened to kill himself. The incident ended when their daughter called to them from the house. The next day, August 30, Lynn Jackson left the marital home with their daughter to live with her mother.

On the same day, August 30, Jackson confided to his friend and supervisor, defendant Joe Smart, that his wife was leaving him and that he had threatened suicide the night before. Jackson, however, assured Smart that the threats were a bluff to prevent his wife from leaving him and that he was fine and able to work. He turned down Smart's suggestions that he seek counselling or take time away from

work. They agreed to meet that evening after Jackson finished his shift. Over the next few days, Smart monitored Jackson's work by listening to the scanner, talking to Jackson in person and by telephone and inquiring of Jackson's dispatchers and colleagues. Smart, however, did not report Jackson's suicide threat or any of his related marital difficulties to any superior officer until September 4, 1985, the day of the killing.

There is no evidence that Jackson experienced difficulties in performing his duties during this period. He arranged for his wife and daughter to return to the marital home while he went to live with his mother.

On the morning of September 4, Lynn Jackson met her husband, who was off duty, at an automobile repair shop where he left his patrol car to be serviced. During the course of the morning, the Jacksons discussed their marital problems and Lynn Jackson told her husband that she was having an extramarital affair with David Gulledge, Jr. This was the first Jackson knew of the existence of Gulledge and of the affair. The same morning, the Jacksons met with a lawyer to discuss a divorce on the ground of adultery. Jackson then requested his wife to drive her car to the Gulledge family business where he engaged in an altercation with David Gulledge, Jr., before leaving.

After he picked up his patrol car from the repair shop, Jackson met his wife at the marital home. He then forced her into the "escape-proof" backseat of the patrol car and drove off. Jackson radioed his dispatcher, asking to talk to Smart. Smart, however, was out of radio range. Jackson drove to the Gulledge family business. As his wife and Gulledge's mother watched, Jackson fatally shot Gulledge ten times with a semiautomatic rifle that was in the trunk of the patrol car. The rifle was Jackson's personal property. His service revolver lay unused on the hood of the patrol car.

At the time of the shooting, Jackson was off duty, dressed in street clothes and carrying his own personal weapon. Although he was off duty, he was driving his patrol car and, in accordance with departmental policy, was carrying his identification card, badge and service revolver while driving the patrol car. The shooting, however, was carried out away from the patrol car and there is no evidence that Jackson employed any of the "tools of his trade" once he left its vicinity. Notwithstanding Jackson's unsuccessful attempt to talk to Smart by radio, there is no evidence that Jackson actually advised anyone at the sheriff's department of his whereabouts or intentions until after the shooting had occurred.

## II.

Summary judgment is appropriate only when the pleadings, depositions, interrogatory answers, admissions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of showing the absence of a genuine issue of material fact. *Diebold*, 369 U.S. at 655, 82 S.Ct. at 994. Rule 56(e), however, provides that a party opposing a properly supported motion for summary judgment may not rest on the mere allegations of his pleadings but must set forth or point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The defendants in this action are Joe A. Smart, a deputy sheriff with the rank of captain who was Jackson's supervisor, J. Elbert Pope, the elected sheriff of York County who was under suspension from office pending criminal charges at the time of the shooting, and John Hunsucker, who had been appointed acting sheriff at the time of the shooting. The defendants are being sued in both their individual and official capacities. The plaintiff asserts two grounds for holding the defendants liable under 42 U.S.C. § 1983: (1) gross negligence, willfulness, wantonness and recklessness by the defendants in supervising and retaining a deputy who was unfit for duty and who was "on duty" whenever he was in his patrol car, including a failure to

promulgate departmental policies for controlling such unfit deputies; and (2) a breach of the defendants' alleged duty to protect the public at large and the decedent in particular from violence at the hands of a deputy sheriff.

### A.

The Fourth Circuit has recognized that a cause of action may arise under § 1983 as interpreted in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978), where a deficient program of police training and supervision allegedly results in a police officer's violation of the constitutional rights of others. *Spell v. McDaniel*, 824 F.2d 1380, 1389–91 (4th Cir. 1987). Chief among the substantive requirements for establishing liability for police misconduct, described in *Spell* as "stringent indeed," 824 F.2d at 1391, is the requirement that there be "at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Id.* at 1387–88.

The defendants admit that the York County Sheriff had no policies or procedures for dealing with emotionally impaired officers. The plaintiff asserts that the defendants should have had a policy requiring that any deputy who showed signs of depression, as Jackson had, be compelled to seek treatment and, further, be denied access to firearms and "instruments of coercion, such as [a] patrol vehicle." (Plaintiff's Memorandum, p. 15). The Court agrees with the defendants, however, that the essential element of causation is lacking. The defendants' failure to require that Jackson submit to treatment cannot be found to have proximately caused Gulledge's death in the absence of evidence that Jackson would have affirmatively responded to such treatment. Moreover, it is clear from the evidence that the rifle used in the shooting was Jackson's personal weapon, not a firearm issued or approved by the York County Sheriff. Therefore, any attempt to restrict Jackson's access to departmental weapons would have been fruitless. Finally, the record is devoid of evidence that Jackson's use of the patrol car played any role at all in the shooting except to transport Jackson to the scene.[1] Because Jackson could have used his personal car to the same end, the Court concludes that the failure to promulgate a policy denying access to "instruments of coercion" such as the patrol car did not proximately cause Gulledge's death.

The shooting, tragic though it was, was entirely personal in nature; there was a direct emotional involvement with the victim. The incident was unrelated to Jackson's law enforcement activities or duties and could have occurred in exactly the same fashion had Jackson no longer been employed by the York County Sheriff or had he taken a leave of absence. For these reasons, the Court finds that the plaintiff

---

1. During his deposition testimony, Smart stated that personal weapons could be carried in a patrol car only with proper approval pursuant to the department's firearms policy. (Deposition of Joe A. Smart, pp. 93–94; Plaintiff's Exh. 4). Smart opined that this policy applied whether or not the deputy was on duty. "If they're in the vehicle they're on duty as far as I'm concerned.... Because they're to respond to any emergency situations so; therefore, he's on duty if he's in the vehicle even if he's not getting paid to be there. That's the way I interpret it." (*Id.*, p. 94).

The plaintiff relies heavily on this testimony to establish the defendants' liability. The Court finds that this statement, however, does not establish that Jackson was "on duty" at the time of the shooting and thus subject immediately and directly to the defendants' control. Jackson

was plainly off duty and on a personal errand. *Cf. Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975), *cert. granted*, 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760, *cert. dismissed as improvidently granted*, 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976) (nature of act performed, not duty status, determines whether "color of state law" present). Moreover, it does not support the plaintiff's contention that the sheriff's department furnished Jackson the opportunity and the means of killing Gulledge: Jackson was not responding to an emergency situation and there is no evidence that the patrol car played any significant role in the shooting. While the statement emphasizes the difficulty of determining the extent of the sheriff's department's duties of supervision, the Court does not reach this issue inasmuch as it finds the requisite causal relationship lacking.

has failed to establish that the defendants' alleged omissions in supervising and retaining Jackson proximately resulted in Gulledge's death as required under *Spell.*

### B.

■ The defendants further challenge the plaintiff's assertion that they should be held liable for failing to protect the decedent from violence at the hands of a deputy sheriff. The Court concludes that the defendants owed no duty to the plaintiff or her decedent. It is well established that the Fourteenth Amendment does not impose on the defendants a general affirmative duty to the public at large. *See Jensen v. Conrad,* 747 F.2d 185, 194 (4th Cir. 1984). Thus, only if the plaintiff established the existence of a "special custodial or other relationship[ ] created or assumed by the state in respect of particular persons" could the Court find that the defendants owed Gulledge an affirmative duty. *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir. 1983). Such a "special relationship" could be found to arise if the defendants knew of Gulledge's plight. *Jensen,* 747 F.2d at 194–95 n. 11.[2]

Here, there is no evidence that the defendants had knowledge of the existence of David Gulledge, Jr., much less of his relationship with Lynn Jackson and any personal danger arising therefrom. The plaintiff contends that Smart should have known or "failed to learn from Richard Jackson that he [Jackson] was on his way to a confrontation with David Gulledge, Jr." (Plaintiff's Memorandum in Opposition to Summary Judgment, pp. 17–18). It appears that when Jackson attempted to talk to Smart by radio shortly before the shooting, Smart was out of radio range in violation of departmental procedures. The plaintiff's argument is nevertheless spurious. The reason for and the circumstances of Smart's unavailability are irrelevant to the determination of whether a special relationship existed between the decedent and the defendants that gave rise to a duty to protect. It is insufficient merely to assert that Smart, in monitoring Jackson, should have discovered that Gulledge was in danger of imminent harm but did not. The sole relevant inquiry is whether a special relationship existed and the record plainly reveals that none of the defendants had actual knowledge that David Gulledge, Jr., was in peril. In the absence of such knowledge, the Court finds no "special relationship" existed between the defendants and Gulledge that differentiated Gulledge from the general public and gave rise to an affirmative duty on the part of the defendants.

For these reasons, the Court concludes that there is no genuine issue of material fact as to the plaintiff's claim under 42 U.S.C. § 1983. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The plaintiff has failed to establish sufficient facts to raise a jury question as to either of her claims that the alleged negligent supervision and retention of Jackson proximately caused the decedent's death or that the defendants owed the decedent an affirmative duty of protection. Accordingly, summary judgment is granted the defendants in both their official and individual capacities.

### III.

In addition, even if the defendants could be held liable in their official capacities, and the Court expressly concludes that they cannot,[3] the defendants are entitled to qualified immunity from any liability in their individual capacities.

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as

---

**2.** The facts of this case do not establish a "special relationship" between Gulledge and the defendants by virtue of the defendants having legal custody of Gulledge or by virtue of the defendants' express identification of Gulledge as one whom they sought to protect. *See Jensen v. Conrad,* 747 F.2d at 194–95 n. 11 (listing some of the factors to be considered in determining the existence of a "special relationship"). Nor has the plaintiff identified any other factor present in this case on which such a relationship might be hinged.

**3.** *See infra,* Part IV.

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In considering a defendant's claim of qualified immunity, the court must focus on the particular facts involved in the alleged deprivation and whether the law at the time of the alleged deprivation was "clearly established." As the United States Supreme Court has recently explained:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* — U.S. —, —, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987) (citations omitted).

■ The Court first finds that the defendants' actions in supervising and retaining Jackson did not violate any constitutional right, whether "clearly established" or not, and thus, under *Harlow,* the defendants are entitled to qualified immunity as to that claim. Under *Monell* such liability arises only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." 436 U.S. at 694, 98 S.Ct. at 2037. In *Monell,* the causal connection between the City of New York's pregnancy leave policy and the alleged violation was manifest; moreover, subsequent decisions have not relaxed the requirement that causation be "proximate." *See City of Oklahoma City v. Tuttle,* 471 U.S. 808,

823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Spell,* 824 F.2d at 1387–88. Thus, without addressing the issue of whether, under the law existing at the time of the shooting in 1985,[4] the specific allegedly reckless acts or omissions could have given rise to a "clearly established" right, the Court finds that the lack of evidence establishing proximate causation as discussed above forestalls further inquiry into whether the plaintiff's alleged rights were "clearly established." In other words, every clearly established constitutional right nonetheless requires proximate causation to be actionable.

■ Turning now to the second ground asserted for liability under Section 1983, the Court concludes that Gulledge had no "clearly established" right to affirmative protection under the facts of this case. In *Jensen,* the Fourth Circuit addressed the right to affirmative protection previously recognized in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), and *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983), and set forth guidelines by which to determine whether a special relationship exists under the particular facts of a case. Although the defendants here were on notice of the existence of the right to protection and the *Jensen* guidelines at the time of the shooting in 1985, the Court finds that the defendants could not have anticipated that Gulledge had such a right under the facts of this case.[5] No reasonable officer, acting as the defendants did in this case, could have understood that his acts or omissions violated an affirmative right to protection under *Jensen. See Creighton,* 107 S.Ct. at 3039. Accordingly, the Court finds that the defendants are entitled to qualified immunity from liability under the plaintiff's Section 1983 claim.

---

4. *Monell* was decided in 1978; the *Tuttle* decision was handed down June 3, 1985, less than three months before the relevant incidents in this case. Both can be distinguished factually from this case. Moreover, neither explored the "full contours" of Section 1983 liability for injuries inflicted pursuant to government "policy or custom." *Monell,* 436 U.S. at 694, 98 S.Ct. at

2037. Not until *Spell v. McDaniel,* which was decided in 1987, was the extent of such liability clarified in this Circuit. Thus, it is doubtful that the defendants' acts or omissions violated a right "clearly established" in 1985.

5. *See supra,* Part II B.

## IV.

With respect to the defendants' liability in their official capacities, the eleventh amendment prohibits a federal court from entertaining an action for any kind of relief where the defendant is a state or a state agency. *Florida Dept. of Health Rehabilitative Servs. v. Florida Nursing Home Ass'n.*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981); *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Missouri v. Fiske*, 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145 (1933); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In addition, an action against a public official in his official capacity is beyond the jurisdiction of a federal court if that official is deemed to be an agent of the state. *McConnell v. Adams*, 829 F.2d 1319 (4th Cir.1987); *see Kentucky v. Graham*, 473 U.S. 159, 165–166, 105 S.Ct. 3099, 3104–3105, 87 L.Ed.2d 114 (1985). The Court concludes under *McConnell* that the defendants cannot be sued in their official capacities because they are agents of the state and are therefore outside its jurisdiction.

In *McConnell,* the Fourth Circuit held that certain election officials (a county registrar and county electoral board members) were state employees under Virginia law and thus could not be sued in their official capacities because of the eleventh amendment jurisdictional bar. The court reviewed several state statutes and decisions and then analogized the public employee to the private employee in determining the former's status. It found "traditional principles of employer-employee law" reinforced its conclusion, especially the element of power to control the employee's actions. 829 F.2d at 1328. Because the "state alone has the power to control the action, duties and policies of electoral boards and registrars," their actions were those of state employees and therefore, in their official capacities, those of the state. *Id.* Relying on *Kentucky v. Graham, supra,* the court held the eleventh amendment barred an award of damages against them in their official capacities.

In South Carolina, similar common law principles defining the master and servant relationship apply. *See Daniel v. Swearingen,* 6 S.C. 297, 24 Am.Rep. 471 (1875). Again, the potential power of control is the most significant factor. *Watkins v. Mobil Oil Corp.,* 291 S.C. 62, 352 S.E.2d 284 (S.C.App.1986). While the state constitution establishes the elective office of county sheriff and his term of office, it also provides that the General Assembly is to prescribe his duties and compensation. S.C. CONST. art. V § 24. Accordingly, the General Assembly through numerous statutes has set forth the sheriff's (and his deputies') duties and compensation. *See* South Carolina Code of Laws, 1976, §§ 23–11–10 *et seq.;* § 23–13–10; § 4–9–30(5) and (7). The sheriff's arrest powers relate primarily to state offenses. *Id.* §§ 17–13–30, 23–15–50. Indeed, even the sheriff's territorial jurisdiction, namely, county-wide, is in effect prescribed by the legislature through the statutory designation of county boundary lines. *Id.* §§ 4–3–10 *et seq.* Although the sheriff as an elected official is not subject to hiring and firing by the state, the legislature has nevertheless prescribed that the Governor is the public official empowered to remove the sheriff from office for misconduct and to fill a vacancy in that office. *Id.* § 1–3–240; § 23–11–40.[6]

---

**6.** Section 23–11–40 provides that a vacancy in the office of sheriff is filled by gubernatorial appointment until either the next general election for county sheriffs or a special election to elect someone to hold the office until the next general election for county sheriffs depending on when the vacancy occurs. Section 1–3–220(2) provides that the Governor appoints an officer to fill any vacancy in a "county office" until the next general election. The South Carolina Supreme Court has interpreted these two provisions *in pari materia* to mean that the Governor fills a vacancy in the sheriff's office until the next general election for county sheriffs. *Privette v. Grinnell,* 191 S.C. 376, 4 S.E.2d 305 (1939). Although by this interpretation the State Supreme Court has concluded that the sheriff's office is a county office for the purpose of filling a vacancy, that conclusion does not prevent this Court from determining that the sheriff acts as an agent of the state, not the county, in light of the state's potential power of control over him. *See McConnell v. Adams,* 829 F.2d at 1326 n. 5; *see also Patel v. McIntyre,* 667 F.Supp. 1131, 1145 n. 26 (D.S.C.1987), *aff'd,* 848 F.2d 185 (4th Cir.1988) (concluding sheriff and

As in *McConnell,* "the inescapable conclusion is that [a county sheriff] [is] dominated by the state." 829 F.2d at 1328.

Similarly, the position of deputy sheriff in South Carolina is more closely connected to the state than to the county. In *Heath v. Aiken County,* —— S.C. ——, 368 S.E.2d 904 (1988), the South Carolina Supreme Court clarified its earlier decisions regarding the applicability of "county employee" statutes to a deputy sheriff. *See, e.g., Rhodes v. Smith,* 273 S.C. 13, 254 S.E.2d 49 (1979). Reversing the lower court's finding that Aiken County Council's authority to develop personnel policies and procedures regulating "county employees" extended to a deputy sheriff, the court declared:

> The county governing powers set out in Section 4–9–30 are 'subject to the general law of this State....' The 'general law' on deputy sheriffs is well-settled in South Carolina: a deputy serves at his sheriff's 'pleasure.' ... Section 23–13–10 also holds the sheriff 'answerable for neglect of duty or misconduct in office of any deputy.' Section 23–13–50 empowers a deputy sheriff to perform 'any and all of the duties appertaining to the office of his *principal*,' i.e. the sheriff. (emphasis added). A deputy, then, acts as his sheriff's agent under South Carolina law.[3]

. . . . .

> Implementation of such policies [as involved here] would afford Council a degree of day-to-day control over deputies irreconcilable with the common and statutory law of this state. A deputy's 'serv[ice]' at the sheriff's pleasure,' ..., entails not only *how long* he serves, but *how* he serves.

---

[3] The federal courts have so recognized. In *Allen v. Fidelity & Deposit Co. of Maryland,* 515

F.Supp. 1185 (D.S.C.1981), *aff'd,* 694 F.2d 716 (4th Cir.1982), a Title 42 U.S.C. § 1983 action involving the Aiken County Sheriff's Department, the court wrote that 'a deputy sheriff has been considered, both under South Carolina common and statutory law, as the agent of the sheriff, not as "employee" of the county' (citations omitted). The court concluded that 'it is abundantly clear that historically in South Carolina the deputy sheriffs are answerable only to the sheriff and not the county government.' *Id.* at 1190.

368 S.E.2d at 905 (citations omitted and emphasis original).

In sum, South Carolina's county governing bodies "have no measurable control over the appointment, discharge, ..., duties, or policies of the [sheriff and his deputies]." *McConnell v. Adams,* 829 F.2d at 1327. The Court concludes therefore that the defendants were acting as agents of the state when they took (or failed to take) the actions complained of.[7]

## V.

The plaintiff's remaining causes of action allege negligence and recklessness by the defendants under state law. The allegations on which state tort liability is premised are the same as those already addressed in terms of Section 1983 liability. To maintain an action for negligence, a plaintiff must show the existence of a duty, a breach of that duty and damages. *Brown v. South Carolina Insurance Co.,* 284 S.C. 47, 324 S.E.2d 641 (Ct.App.1984), *cert. dismissed,* 290 S.C. 154, 384 S.E.2d 530 (1986).

With regard to the plaintiff's allegations of negligent supervision and retention of Jackson, the Court finds, for the reasons stated above, that the plaintiff has failed to establish actionable negligence because the facts do not support a causal link

---

county are distinct and separate entities in South Carolina and sheriff does not act as "county" policymaker in law enforcement matters).

7. The Court further concludes that South Carolina has not waived its eleventh amendment immunity. A Section 1983 claim does not by itself effect a waiver of eleventh amendment immunity. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Moreover,

the State has not voluntarily waived its immunity. The South Carolina Tort Claims Act, South Carolina Code of Laws, 1976, as amended, §§ 15–78–10 *et seq.,* expressly declares that the waiver of sovereign immunity provided for therein does not extend to the state's or its political subdivisions' eleventh amendment immunity from suit in federal court. § 15–78–20(e).

between the defendants' acts or omissions and the decedent's injury.

■ With regard to the plaintiff's allegations concerning the failure to identify and protect the decedent, the Court concludes that ordinarily the common law imposes no affirmative duty to act. *Brown, supra.* The Court is unable to discern the source of the duty alleged, either from statute, relationship or other circumstance. *See Patel v. McIntyre, supra; Sharpe v. Dept. of Mental Health,* 292 S.C. 11, 354 S.E.2d 778 (Ct.App.1987), *aff'd cert. dismissed,* 366 S.E.2d 12 (1988). Accordingly, the Court concludes that there is no genuine issue of material fact as to the plaintiff's state law claims.

## CONCLUSION

For the reasons stated above, the Court grants the defendants' motion for summary judgment as to all causes of action pursuant to Rule 56.

IT IS SO ORDERED.