**SUTPHIN PHARMACY, INC.,**
**et al., Plaintiffs,**

v.

**Cesar A. PERALES, Individually, and as Commissioner of New York State Department of Social Services, Defendant.**

No. 90 Civ. 7609 (WCC).

United States District Court,
S.D. New York.

July 19, 1991.

Wise, Lerman & Katz, P.C., New York City (Jerome I. Sager, Laurie Lombardo, of counsel), for plaintiffs.

Robert Abrams, Atty. Gen. of State of N.Y., New York City (Robert J. Schack, Barbara P. Demchuk, Asst. Attys. Gen., of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiffs Sutphin Pharmacy, Inc. ("Sutphin"), Columbus ("Columbus") and 103rd Street Drug, Inc. ("103rd Drug"), and Empire State Pharmaceutical Society, Inc. ("Empire") bring this action under 42 U.S.C. § 1983 for injunctive relief and damages against Cesar A. Perales, individually and as Commissioner of New York State Department of Social Services (the "Department"). Plaintiffs also seek to enjoin the Department from further implementing its Electronic Medicaid Eligibility Verification System ("EMEVS") pursuant to Title 18 N.Y.C.R.R. Part 514.

This action was commenced by service of a summons and complaint on defendant on December 3, 1990. Subsequently, by Order to Show Cause for a Temporary Restraining Order and a Preliminary Injunction, returnable December 17, 1990, plaintiffs sought to enjoin defendant, during the pendency of the action, from further implementing and using the EMEVS. At the hearing on December 17, 1990, the parties agreed to a trial on the merits to commence the following day. Accordingly, this Court held a non-jury trial on December 18, 1990 and received post-trial memoranda on behalf of the parties thereafter. This opinion incorporates the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

### BACKGROUND

Plaintiffs Sutphin and Columbus are pharmacies located in New York City that participate in the New York State Medicaid program. Plaintiff Empire is a state-wide professional society of pharmacists who own retail pharmacies in New York State, the majority of which are located in New York City. As Medicaid providers, plaintiffs supply the pharmaceutical needs of Medicaid recipients and submit reimbursement claims therefor directly to the Department. Plaintiffs' Memorandum, at 4.

In an effort to reduce fraud and paperwork and process Medicaid claims more efficiently, the Department introduced the EMEVS on August 1, 1990, pursuant to 18

N.Y.C.R.R. Part 514.[1] The EMEVS requires certain Medicaid providers, as designated by the Department, to verify eligibility for all Medicaid recipients prior to providing any services.[2] In order to guarantee reimbursement from Medicaid, designated providers are instructed to access the EMEVS through a Medicaid Eligibility Terminal (a "MET") to solicit authorization for the services requested.[3] In the case of a participating pharmacy, the MET is used to ensure that a Medicaid recipient who is seeking to have a prescription filled is both Medicaid eligible and authorized by a physician or like provider to receive a particular drug in the prescribed quantity. The METs are furnished by the Department.[4]

The EMEVS was designed to flag defective claims. The system "pends" a claim or withholds payment of the claim for review (a) when the claim submission is incomplete, (b) when the claim is being adjudicated in some other administrative process, or (c) when it is being reviewed by a medical professional. Transcript, at 100–01. Rather than denying a claim outright and thereby forcing a provider to resubmit a claim, the EMEVS "recycles" a pending claim so that it might be checked again later against more recent information placed on the system. Such information might presumably include a recent "posting" of required services that may not have been in the system at the time a pharmacy attempted to "clear" a prescription. As a matter of policy, a potentially defective claim is "pended" for 30 days. Transcript, at 97, 101.

Plaintiffs argued at trial that the EMEVS is being applied in a disparate

---

1. The EMEVS was put in place

... to avoid unnecessary processing of medical assistance (MA) claims, administrative expense to the MA program, provider billing errors resulting in nonpayment of claims and to reduce unacceptable provider practices, ...

Title 18 N.Y.C.R.R. Part 514.1(a).

2. Mary Alice Brankman, a health care administrator in the office of audit and quality control with the Department, testified that the EMEVS is applied to pharmacies and other providers who report a high volume of Medicaid business or a sudden upsurge in transactions suggesting a possibility of error or fraud. Transcript, at 94. Under 18 N.Y.C.R.R. Part 514.4, a provider must utilize a MET to verify eligibility through the EMEVS if it meets or exceeds the following criteria:

1. the dollar value of claims submitted for care, services or supplies ordered by the provider for the prior 12 month period exceed $75,000; or

2. the dollar value of claims submitted for care, services or supplies ordered by the provider for a weekly period, when projected to a yearly period, will exceed $75,000; or

3. the number of claims submitted by the provider for a quarterly period places the provider in the upper quartile of a rank order listing of billers in the applicable provider type; or

4. the claims submitted by the provider indicate frequent, repetitive encounters with recipients or repetitive dispensing pattern; or

5. the claims submitted by the provider for a weekly period indicate an increase of 10 percent or more in total amount billed, average cost per claim or average cost per recipient encounter from the previous quarter; or

6. the claims submitted by the provider for a quarterly period exceed by two standard deviations or more the average number of claims per recipient encounter submitted or average dollar value of claims per recipient encounter submitted by billers in the applicable provider type.

Title 18 N.Y.C.R.R. 514.4; Transcript, at 94.

3. Referring to the procedures that Medicaid providers must follow under the EMEVS, Title 18 N.Y.C.R.R. Part 514.1 requires that:

... (b) A provider required to do so must verify MA [Medical Assistance] recipient eligibility by making an inquiry to an electronic data system prior to furnishing any item of care, services or supplies for which payment will be claimed under the MA program....

(d) A provider required to verify recipient eligibility or orders for care, services or supplies who fails to verify properly may have payment for claims under the MA program withheld or denied or be subject to sanctions,

...

18 N.Y.C.R.R. Part 514.

4. As an operational matter, when a Medicaid patient is in need of medical or pharmaceutical attention, a designated primary care provider must swipe the patient's plastic identification card through the MET and input the number of pharmacy prescriptions or laboratory tests required for that patient. After these orders are "posted" on the EMEVS system by a physician, hospital, or other such provider, they are "cleared" off the EMEVS by the laboratory or pharmacy rendering the required services. The "card swipe" and "post and clear" programs make the verification of eligibility and the clearing of posted claims a prerequisite to all payment of claims. Transcript, p. 93.

manner to selected providers in violation of the equal protection clause of the Constitution, and that those providers subject to the regulations are being summarily deprived of their property right to reimbursement on the EMEVS claims without due process.[5] Plaintiffs offered the testimony of Mr. Fred Wein, supervising pharmacist at Marben Pharmacy. Mr. Wein testified that while his pharmacy's procedure was to swipe, post and clear every prescription for Medicaid, there were instances where the pharmacy used a MET to reconfirm a recipients' eligibility on a retroactive basis. Transcript, at 11. With reference to past problems with the EMEVS and the claim that about 60 percent of the claims which were "pended" on the October 19, 1990 remittance statement were still pending, Mr. Wein testified that the pendency problem "... decreased over the last couple of weeks ..." and that only a "minimal amount" of his claims are currently being "pended". Transcript, at 27.

Plaintiffs also offered the testimony of Mr. James Marinos, a partner in ten pharmacies, including plaintiff Sutphin Pharmacy. Mr. Marinos testified that his pharmacies never engaged in the practice of retroactive eligibility verification for Medicaid prescriptions. Transcript, at 57. He informed the Court that the claims denied or "pended" by the Department "... have been running about 40 percent since September [1990]" and has proven to be damaging to his business. Transcript, at 59. Mr. Marinos admitted having based his testimony on accumulated monthly reports and acknowledged that his data were based on the dollar total of claims "pended" and not the number of claims. Transcript, at 64.

In addition to the testimony of Mary Alice Brankman, referred to above, defendant offered the testimony of Raymond Burkitt, director of MMIS (Medicaid Management Information System) with the New York State Department of Social Services. Mr. Burkitt demonstrated the use of the EMEVS and showed the Court how a MET could be used to obtain authorization on a retroactive basis. Transcript, at 162. Mr. Burkitt also provided the Court with relevant statistics indicating that of the 600,000 claims processed for payment to pharmacies by Medicaid on a weekly basis, approximately 599,000 claims are processed using the EMEVS system in less than 10 days. For those claims requiring a resubmission or manual payment for a variety of reasons, Mr. Burkitt testified that processing time was 2 to 3 weeks. Transcript, at 169–170.

Both Mr. Burkitt and Mr. Marinos addressed the issue of reimbursement claims made for services provided to nursing home residents. Mr. Marinos explained that plaintiff Sutphin has been denied reimbursement for services rendered in reliance on an EMEVS authorization because the recipient was subsequently found to be a "nursing home resident" and thus ineligible for Medicaid-sponsored prescriptions by the Department.[6] Mr. Burkitt testified that each of the nursing home examples raised by Mr. Marinos predated the regulation upon which plaintiffs base their claim. Transcript, at 182. Mr. Burkitt further testified that under the current policy, if a pharmacy provides pharmaceutical service to a nursing home recipient because the

---

**5.** In undertaking its analysis, the Court reviewed the list of reimbursement claims set forth in plaintiffs' complaint, affidavits and supporting memoranda. This compilation consisted primarily, but not exclusively, of the 35 reimbursement claims raised in ¶ 12 of attorney Jerome Sager's affidavit in support of plaintiffs' motion for a preliminary injunction and the 54 claims enumerated in ¶ 14 of the same document.

**6.** According to the testimony of Mr. Burkitt, the Department does not furnish nursing home patients with computerized Medicaid cards with which providers may access the EMEVS. Transcript, p. 179. Medicaid does not permit provider pharmacies to service nursing home residents who receive their necessary medication at the facility itself. However, as Mr. Marinos testified and Mr. Burkitt acknowledged, there exists the possibility that a patient, once placed in a nursing home, may still be in the possession of a Medicaid card which was not retrieved upon that individual's entrance into the home. Mr. Marinos explained that people "go in and out of ... nursing homes and the state never catches up [with their] eligibility...." Transcript, p. 184.

recipient's Medicaid card is cleared as eligible on the EMEVS, the claim will initially be denied by the automated system but will be paid off-line, following a inquiry by the Department and further submissions by the provider. Transcript, at 178–9.

## DISCUSSION

### (1) EQUAL PROTECTION

Plaintiffs allege that the Department's implementation of the EMEVS constitutes a violation of the equal protection clause of the Fourteenth Amendment to the Constitution in that all Medicaid providers are not being treated equally with respect to the application of 18 N.Y.C.R.R. 514.[7] Specifically, plaintiffs claim that the statute is being implemented on a selective basis to pharmacies, as opposed to other provider types, in New York City and that pharmacies in other regions of New York State are not being subjected to the regulation on an equal basis. Plaintiffs contend that such selective application of the law bears no rational relationship to the object of the legislation.

■ In applying the Equal Protection Clause, the Supreme Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); *McDonald v. Board of Election Comrs.*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). The Equal Protection Clause does, however, deny to States the power to apply a statute in a discriminatory fashion or to legislate treatment of persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. *Reed v. Reed*, 404 U.S. 71, 76–77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). A classification must be reasonable, not arbitrary, and with reference to distinctions that do not affect any fundamental right or affect some suspect class of persons, must rest upon some ground of difference having a rational relation to the object of the legislation, so that all persons similarly situated are treated alike. *See Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

■ The question presented by this case is whether a distinction among types of Medicaid providers and between pharmacies in upstate New York and those located in New York City bears a rational relationship to the state objective that is sought to be advanced by the operation of Title 18 N.Y.C.R.R., Part 514. The Court concludes that it does. In that one of the primary objectives of the regulation was to "reduce fraud," there is little question that the Department's focus on pharmacy providers in New York City, a region with a statistically larger provider population and a perceptively higher incidence of Medicaid fraud vis-a-vis upstate New York, bears a rational relationship to the objectives outlined in Part 514 of the regulations. Accordingly, the Court concludes that the disparate application of the EMEVS to certain classifications of Medicaid providers bears a "rational relationship" to legitimate state objectives. *See Reed v. Reed*, 404 U.S. 71, 76–77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971).[8]

Having considered plaintiffs' first constitutional challenge, the Court finds no reason to enjoin the Department from continuing to implement the EMEVS system and

---

7. The Department does not contest the fact that the EMEVS is applied on a disparate basis according to provider type and geography. Ms. Brankman testified that the Department's concentrated efforts to apply the EMEVS downstate and particularly to pharmacies was a result of the Department's audit experience which,

> "... using the strategies of selecting providers for audits, we found only five providers in laboratory, pharmacy, and another category to be audited in the upstate area, and in New

York City we found many, perhaps as many as a hundred." Transcript, p. 127.

8. In view of this conclusion, the Court need not resolve its doubt about plaintiffs' standing to "complain about the fact that the law isn't being applied to pharmacies upstate." Transcript, p. 2. The conclusion is reinforced by plaintiffs' failure to demonstrate any class, racial or other form of invidious discrimination.

turns to plaintiffs' second constitutional argument.

## (2) PROPERTY INTEREST

■ The gravamen of plaintiffs' second constitutional claim is that the state's pending of plaintiffs' reimbursement claims constitutes a deprivation of plaintiffs' property without due process in violation of the Fifth and Fourteenth Amendments to the Constitution. In order for plaintiffs to prevail upon their claim, they must establish the existence of a valid property interest. Such interests are created, not by the Constitution, but by an independent source such as state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiffs rely here on New York's recognition of a property interest "in money paid for services already performed in reliance on a duly promulgated reimbursement rate." *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir.1984)[9]; *White Plains Nursing Home v. Whalen*, 53 A.D.2d 926, 927, 385 N.Y.S.2d 392, 394 (3d Dept.1976), *aff'd* 42 N.Y.2d 838, 397 N.Y.S.2d 378, 366 N.E.2d 79 (1977). Alleging a violation of this property interest, plaintiffs ask this Court to enjoin defendant from continuing to withhold payment of plaintiffs' outstanding claims and to block further implementation of the EMEVS.[10]

■ After carefully reviewing the evidence presented, the Court finds that plaintiffs' reliance on the property right referenced in *Oberlander* is misguided as it applies to those claims involving retroactive EMEVS verification. A property interest in money owed for services performed in reliance on state reimbursement does not vest where no preexisting reliance is demonstrated. The fact that plaintiffs accessed the EMEVS retroactively, albeit on a limited basis, necessarily means that plaintiffs dispensed pharmaceutical services absent any assurance from the state that they would be reimbursed by Medicaid.[11] On that point alone, plaintiffs'

**9.** While the Court in *Oberlander* acknowledged that New York recognizes a property interest in money owed for services already performed in reliance on a stipulated reimbursement rate, the principal ruling in *Oberlander* was that Medicaid providers "clearly have no property interest in *future* reimbursements under New York law ..." *Oberlander v. Perales*, 740 F.2d at 120 [emphasis added]. As the Court of Appeals for the Second Circuit noted in *Tekkno Laboratories, Inc. v. Perales*, 933 F.2d 1093 (2nd Cir.1991), *Oberlander* did not involve the State's withholding of payments pending investigation as is the case here, but dealt with changes in Medicaid reimbursement rates for claims not yet filed with the State.

**10.** As a matter law, it should be noted that the scope of interim relief this Court may consider is limited by the Eleventh Amendment. The Eleventh Amendment provides a state, as well as its agencies and its officials acting in their official capacities, with protection from suits in federal court for damages for past wrongs. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). "In general, federal suits against such defendants for monetary awards out of state funds are barred." *Tekkno Laboratories, Inc. v. Cesar A. Perales*, 933 F.2d 1093, 1097 (2nd Cir.1991). This limitation applies equally to claims brought by Medicaid providers against states for payment of past-due claims. *See, e.g., Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Ass'n*, 450 U.S. 147, 101 S.Ct. 1032, 67

L.Ed.2d 132 (1981). It should be noted, however, that while this Court cannot order the state to reimburse plaintiffs for past-due Medicaid claims that should have been paid, but were not, it does have the power to grant prospective relief where warranted.

**11.** Mr. Wein acknowledged on direct examination that Marben Pharmacy had engaged in retroactive authorization after it acquired a printer for the EMEVS and had spoken with numerous representatives of the state Medicaid program about the submission of reimbursement claims. Transcript, at 10–11. In an effort to explain Marben's behavior, plaintiffs contend that Marben engaged the EMEVS on a retroactive basis only to reconfirm service verification for the date of service and to obtain printed proof thereof. They argue that Marben verified recipient eligibility on the date of service without printed confirmation.

The Court is not persuaded. Mr. Wein's testimony that he followed the proper procedures for securing eligibility verification on the date of service is contradicted by Ms. Brankman's testimony and the evidence presented in support thereof. The Department's review of microfiche records of Marben's 35 claims discussed in ¶ 12 of Jerome Sager's affidavit in support of plaintiffs' motion for a preliminary injunction demonstrates that Marben did not make timely and appropriate use of the EMEVS. A similar pattern emerged upon review of a portion of Marben's 54 claims raised in ¶ 14 of Mr. Sager's affidavit. Transcript, at 118–119.

claim to a *vested* property interest in "money paid for services already performed in reliance on a duly promulgated reimbursement rate" founders. *Oberlander v. Perales*, 740 F.2d at 120. Thus absent a triggering of plaintiffs' professed right to reimbursement on those claims involving retroactive engagement of the EMEVS, the Court finds no violation thereof.

■ As for those claims in which plaintiffs obtained service authorization through the EMEVS in accordance with the regulations thereunder, the Court considers the propriety of imposing a durational limit on the length of the state's pendency of such claims. As a matter of law, the state's practice of "pending" plaintiffs' reimbursement claims for reasons contemplated by the EMEVS is constitutionally sound where the state's period of review is limited to a reasonable period of time. *See Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242, 108 S.Ct. 1780, 1788, 100 L.Ed.2d 265 (1988). In determining how long a delay is justified or whether the review of plaintiffs' claims here is so lengthy so as to "... become a constitutional violation," *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985), the Court must consider ... the importance of ... [plaintiffs'] interest and the harm to this interest

occasioned by delay; [as well as] the justification offered by the Government for [the] delay and its relation to the underlying governmental interest ...

*Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. at 242, 108 S.Ct. at 1788.

Plaintiffs' interest in a prompt disposition of their reimbursement claims must be weighed against the state's justifiable concern for the integrity of the system. The Court does not underestimate the acute economic hardship borne by plaintiffs where the Department "pends" their claims for a period beyond 30 days.[12] Where plaintiffs submit their claims to the Department in conformity with the procedures set out under the EMEVS, prompt reimbursement must follow as the provider pharmacies cannot be expected to incur the consequences of high systemic error[13] or unacceptably long periods of review. By the same token, the Department must be accorded some latitude in the time required for a prudent review of claims, particularly in light of the unorthodox behavior of some Medicaid providers.

Accordingly, the Court concludes that where pharmacy providers solicit proper service verification through the EMEVS and receive authorization to dispense prescription drugs, the Department must limit

---

For example, in the course of providing services to Medicaid recipient "ZZ66689E" on September 1, 1990, Marben's only use of the EMEVS to verify the recipient's eligibility for that date of service was on October 13, 1990. There is no indication that Marben ever engaged the EMEVS on September 1, 1990 as would have been required under the regulations. The Court undertook this analysis by comparing the verification slip appearing as "# 1" in Exhibit G of Mr. Sager's affidavit with the Department's "Monthly Recipient verification Report" included in defendant's Exhibit B and market as "# 1" therein.

**12.** Mr. Marinos testified that two of his pharmacies, TCH Drugs and D & R Pharmacy, were in financial difficulty because the state had not paid on valid claims for Medicaid billings. Transcript, at 69–70.

**13.** The term "error rate", as it is used by the Department in administering the EMEVS, does not refer to claims erroneously denied or pended by the system. Rather, the term corresponds

to those claims which fail to meet one of the many "edits" or tests in the EMEVS designed to flag claims which are faulty in some respect and therefore not ripe for immediate payment. In this context, the EMEVS error rate does not reflect any deficiencies in the system, but rather speaks to its efficiency.

As to plaintiffs' contention that the EMEVS is plagued by high systemic error, the Court disagrees. The pended claims enumerated in plaintiffs' supporting memoranda do not elucidate a level of systemic error that is constitutionally infirm or that otherwise provides a sufficient basis for the injunctive relief requested by plaintiffs. Mr. Wein, for example, testified that the system's error rate is now "minimal", despite it being close to 25 percent some months back. Transcript, at 27. Moreover, the statistics provided as a basis for determining the margin of error in the EMEVS were characterized by the Court at trial as "highly, highly misleading" in that they included valid "denials" in the "error" category and aggregated successive months. Transcript, at 61.

its delay in paying or rejecting the claims to 30 days.[14] Where, however, providers seek EMEVS verification in a manner inconsistent with the regulations thereunder, the Department cannot be expected to limit their claim review to 30 days. Unsanctioned use of the EMEVS justifiably heightens the Department's suspicion that such claims may be fraudulent and thereby merits a more detailed and time consuming review by the Department than might otherwise be necessary or acceptable.

The 30–day time limitation must apply equally to those claims which involve nursing home patients who were serviced by plaintiffs in reliance on the Department's EMEVS authorization. Whether such authorization was inadvertent and the result of the Department's failure to retrieve and/or record the invalidation of a recipient's Medicaid card is a problem that must be borne by the Department and not the pharmaceutical providers who innocently rely on the EMEVS eligibility verification and the patients' express or implied representations.[15]

In applying this time limitation, the Court recognizes that there will be an occasional lapse where the Department permits a claim to "pend" for more than 30 days. Such inadvertence should not be considered a violation of the Court's injunction where it arises through no fault of those in charge. The Court's intention here is to provide a general rule of conduct for the Department to follow. The Department will satisfy the Court's order if makes a good faith effort to adopt the 30–day limitation as a practical norm.

## CONCLUSION

 For the above stated reasons, the Department is hereby enjoined from withholding final disposition of plaintiffs' reimbursement claims for services rendered in reliance on eligibility verification properly obtained through the EMEVS for a period greater than 30 days from the date of receipt. This time limitation shall not apply to those reimbursement claims submitted by plaintiffs for services rendered in a manner inconsistent with the EMEVS or otherwise outside the definition of a "Clean Claim" as set out in 42 C.F.R. § 447.45.[16] In all other respects, the operation and implementation of the EMEVS shall remain unaffected by this Order. Plaintiffs' request for attorney's fees is denied.

Plaintiffs shall submit a proposed order to the Court for settlement on 10 days notice.

SO ORDERED.

---

**14.** The decision to impose a 30–day time limitation reflects the Court's desire to provide the Department with a margin of error beyond the normal processing time of two to three weeks. Transcript, at 169–170.

**15.** The Court's conclusion here is consistent with New York State's regulatory impact statement for Title 18 N.Y.C.R.R. Part 514 which stipulates that "[p]roviders who verify recipient eligibility in accordance with [EMEVS] requirements will not be denied reimbursement for care, services or supplies rendered if the recipient is later discovered to have been ineligible for [Medicaid] on the date of service." New York State Register, April 25, 1990, p. 40.

**16.** A "Clean Claim" is defined as

"... one that can be processed without obtaining additional information from the provider of the service or from a third party. It includes a claim with errors originating in a State's claims system. It does not include a claim from a provider who is under investigation for fraud or abuse, or a claim under review for medical necessity."

42 C.F.R. § 447.45(b).